

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-10-2008

# USA v. Geiser

Precedential or Non-Precedential: Precedential

Docket No. 06-4406

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Geiser" (2008). *2008 Decisions.* Paper 941.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/941

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-4406

———

UNITED STATES OF AMERICA

v.

ANTON GEISER,

Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 04-cv-01184)
District Judge:  Honorable David S. Cercone

———

Argued March 3, 2008
Before:  SCIRICA, *Chief Judge*, FISHER
and ROTH, *Circuit Judges*.

(Filed: June 10, 2008  )

Valerie M. Antonette
Samuel J. Reich
Jay K. Reisinger
Reich, Alexander, Reisinger & Farrell
436 Seventh Avenue
1000 Koppers Building
Pittsburgh, PA  15219

Adrian N. Roe (Argued)
Watkins, Dulac & Roe
603 Stanwix Street
Two Gateway Center, 17 East
Pittsburgh, PA  15222
        *Attorneys for Appellant*

Christina Giffin (Argued)
United States Department of Justice
Criminal Division, Appellate Section
10th and Constitution Avenue, N.W.
Patrick Henry Building
Washington, DC  20530

Stephen J. Paskey
United States Department of Justice
Criminal Division
Suite 200
10th Street and Pennsylvania Avenue, N.W.
Washington, DC  20530
        *Attorneys for Appellee*

2

---

OPINION OF THE COURT

---

FISHER, *Circuit Judge*.

In this case, we must decide whether Anton Geiser, who served as an armed Nazi concentration camp guard, "personally advocated or assisted in the persecution of . . . [a] group of persons because of race, religion, or national origin" and is thus ineligible for a visa under the Refugee Relief Act of 1953, Pub. L. No. 83-203 at § 14(a), 67 Stat. 400, 406 ("RRA"). For the reasons that follow, we conclude that Geiser "personally advocated or assisted in . . . persecution" and is ineligible for an RRA visa. Therefore, we will affirm the District Court's order granting the Government's motion for summary judgment and revoking Geiser's United States citizenship.

## I. BACKGROUND

Anton Geiser, an ethnic German, was born in 1924 in a part of what was then Yugoslavia and is now Croatia. After German forces invaded Yugoslavia in 1941, Geiser was drafted into the Waffen Schutzstaffel ("SS"). The SS was the elite guard of the Nazi party, and the "Waffen" SS was the "Armed" SS. Certain units of the Waffen SS, the "Death's Head" battalions, were responsible for guarding concentration camps.

Geiser was chosen for a Death's Head battalion and sent to Sachsenhausen concentration camp near Oranienberg,

Germany. Geiser received training in how to guard prisoners and was told that if a prisoner tried to escape, he should shoot the prisoner with his rifle or sidearm. He guarded the perimeter of the camp and escorted prisoners to and from labor sites. He also served at Buchenwald concentration camp near Weimar, Germany, as well as Arolsen, a subcamp of Buchenwald. Geiser admits that Sachsenhausen and Buchenwald were places of persecution.

When Allied forces approached, Geiser and his fellow guards fled. They obtained civilian clothing and buried their SS uniforms in the woods. After the war, Geiser worked in Germany and Austria. In 1956, he applied for a United States visa under the Immigration and Nationality Act of 1952 and the RRA. Geiser entered the United States in 1956 and was naturalized in the Court of Common Pleas of Mercer County, Pennsylvania, in 1962.

On April 9, 2004, the United States filed a complaint to revoke Geiser's citizenship in the United States District Court for the Western District of Pennsylvania. The complaint alleged that Geiser's service as an SS concentration camp guard rendered him ineligible for a visa under the RRA, which provides: "No visa shall be issued under this Act to any person who personally advocated or assisted in the persecution of any person or group of persons because of race, religion, or national origin." RRA § 14(a). Geiser and the Government filed cross motions for summary judgment.

The District Court rejected Geiser's argument that the term "persecution" in the RRA is ambiguous. Therefore, the

4

Court concluded that *Chevron* deference, as outlined in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), did not apply. Based on the undisputed facts, the Court granted the Government's motion for summary judgment and ordered Geiser's citizenship to be revoked.

Geiser filed this timely appeal. He argues that the term "persecution" is ambiguous, and he asks us to reverse and remand for consideration of the second step of the *Chevron* analysis.

## II. DISCUSSION

The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345. We have jurisdiction under 28 U.S.C. § 1291. We have previously explained our standard of review for an appeal from a grant of summary judgment:

> "We review a district court's grant of summary judgment de novo. Summary judgment is only appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. In reviewing the District Court's grant of summary judgment, we view the facts in a light most favorable to the nonmoving party."

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 260 (3d Cir. 2007) (citations omitted).

A. Applicable Statutes: the INA and the RRA

"[T]he Immigration and Nationality Act of 1952 . . . , 8 U.S.C. § 1451(a), requires revocation of United States citizenship that was illegally procured." *Fedorenko v. United States*, 449 U.S. 490, 493 (1981) (internal quotation marks omitted). The legality of a naturalization "ultimately turns on" an alien's eligibility under the Act under which he was issued a visa. *United States v. Szehinskyj* (*Szehinskyj I*), 277 F.3d 331, 334 (3d Cir. 2002). Therefore, in order to determine whether Geiser's citizenship was illegally procured, we must examine whether he met the RRA's requirements.

The RRA was one of a series of post-World War II immigration statutes. "In 1948, Congress enacted the Displaced Persons Act . . . , [or DPA,] to enable European refugees driven from their homelands by the war to emigrate to the United States without regard to traditional immigration quotas." *Fedorenko*, 449 U.S. at 495. "Section 13 of the [DPA] . . . states . . . : 'No visas shall be issued under the provisions of this Act, as amended . . . to any person . . . who advocated or assisted in the persecution of any person because of race, religion or national origin.'" *Szehinskyj I*, 277 F.3d at 334. In 1953, Congress passed the RRA as a successor statute to the DPA. *United States v. Friedrich*, 402 F.3d 842, 844 (8th Cir. 2005). The RRA provides: "No visa shall be issued under this Act to any person who personally advocated or assisted in the persecution of any person or group of persons because of race, religion, or national origin." RRA § 14(a).

6

The RRA did not displace the then-existing immigration requirements under the Immigration and Nationality Act ("INA"). The RRA states: "No person shall be issued a visa . . . under [the RRA] unless . . . the applicant has established his eligibility for a visa and his admissibility into the United States under this Act and under the immigration laws and regulations." RRA § 11(c).

## B. The Parameters of *Chevron* Step One Analysis

Geiser's appeal rests on his assertion that RRA § 14(a) is ambiguous because it uses the term "persecution." Geiser argues that because of the ambiguity, the District Court should not have stopped with its *Chevron* step one analysis, but should have proceeded to inquire at *Chevron* step two whether the State Department's interpretation of the RRA is reasonable.

We have explained *Chevron* analysis as follows:

"*Chevron* applies when 'it appears that Congress delegated authority to . . . [an administrative] agency . . . to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.' *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). If *Chevron* applies, a court must ask (at what is customarily called step one) 'whether Congress has directly spoken to the precise question at issue.' *Chevron*, 467 U.S. at 842. 'If so, courts, as well as the agency, "must give effect to the unambiguously expressed intent

7

of Congress."' *Household Credit Servs. Inc. v. Pfennig*, 541 U.S. 232, [239] (2004) (quoting *Chevron*, 467 U.S. at 842-43). 'However, whenever Congress has "explicitly left a gap for the agency to fill,"' a court must proceed to step two, and 'the agency's [interpretation] is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute."' *Id.* (second brackets in original) (quoting *Chevron*, 467 U.S. at 843-44). The Court has described this test as one of reasonableness. *See Chevron*, 467 U.S. at 845, 865, 866."

*Chen v. Ashcroft*, 381 F.3d 221, 223-24 (3d Cir. 2004) (parallel citations omitted).

Thus, at step one, the question is "whether Congress has directly spoken to the precise question at issue," *id.* at 224 – whether serving as a concentration camp guard constitutes "personally advocat[ing] or assist[ing] in . . . persecution." RRA § 14(a). At step one, we consider the text and structure of the statute in question. *See Zheng v. Gonzales*, 422 F.3d 98, 120 (3d Cir. 2005). The parties dispute whether further analysis is required at *Chevron* step one. Geiser states that according to our case law, a court should refer to legislative history to confirm its step one statutory analysis. To support this proposition, he cites *Santiago v. GMAC Mortgage Group, Inc.*, 417 F.3d 384, 388 n.3 (3d Cir. 2005). The Government contends that if the statutory text is unambiguous, it is inappropriate and unnecessary to inquire into the legislative history at step one.

8

The Government is correct that legislative history should not be considered at *Chevron* step one. A closer look at *Santiago* and subsequent cases confirms this point. In *Santiago*, we stated:

> "It is not clear whether it is appropriate for us to consider legislative history to determine whether a statute is unambiguous at this point in *Chevron* analysis. *Compare FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 137 (2000) (considering legislative history at step one of *Chevron* analysis), *with K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 293 n.4 (1988) (stating that 'any reference to legislative history . . . is in the first instance irrelevant' in step one of *Chevron* analysis) and *Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 417 (1992) (finding only statutory text is relevant for step one of *Chevron* analysis). However, it is worth noting that the legislative history of [the statute in question] supports the conclusion [we have reached]."

417 F.3d at 388 n.3. *Santiago* merely demonstrates that in light of ambiguous guidance from the Supreme Court, we covered our bases by including a brief reference to the legislative history.

As we noted in *Santiago*, the Supreme Court referred to legislative history when explaining the meaning of the Food, Drug and Cosmetic Act in *Brown & Williamson*. *Id.* (citing 529 U.S. at 133). However, subsequent to *Brown & Williamson*, the

9

Supreme Court returned to its original mode of analysis, which does not include a consideration of legislative history at *Chevron* step one. *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 127 S. Ct. 1534, 1543 (2007) ("[N]ormally neither the legislative history nor the reasonableness of the [agency interpretation] would be determinative if the plain language of the statute unambiguously indicated [Congress's intent].");  *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 132-33 (2002) ("[R]eference to legislative history is inappropriate when the text of the statute is unambiguous."). Thus, we no longer find it necessary to consider legislative history at *Chevron* step one.

Geiser argues that *Fedorenko*, 449 U.S. 490, and *Szehinskyj v. Att'y Gen.* (*Szehinskyj II*), 432 F.3d 253 (3d Cir. 2005), indicate that we should consider legislative history at *Chevron* step one. But these cases, read in their entirety, do not support his argument.

Geiser cites *Fedorenko* to show that the Supreme Court, when deciding whether a concentration camp guard was eligible for a visa under the DPA, took into account the testimony of a foreign service officer who had administered visa applications under the DPA. *Fedorenko*, 490 U.S. at 511. Geiser's reading of *Fedorenko* contains several weaknesses. First, the material the Supreme Court considered in that case was not legislative history, but testimony about agency interpretation of the statute. *Id.* Second, the *Fedorenko* Court relied heavily on the plain meaning of the language of the DPA. *Id.* at 512. Third, citing *Fedorenko* to explain *Chevron* analysis is a dubious proposition, since *Fedorenko* predates *Chevron* by three years. Even if

10

*Fedorenko* did consider legislative history when initially construing the statute's meaning, this approach was altered by the Supreme Court's *Chevron* jurisprudence, which now controls our analysis of the RRA.

Nor does *Szehinskyj II* support Geiser's argument that we should consider legislative history at *Chevron* step one. The petitioner in *Szehinskyj II* was a former concentration camp guard who had received a visa under the DPA, became a United States citizen, and was later denaturalized. 432 F.3d at 254. After his denaturalization, the INS instituted removal proceedings under the Holtzman Amendment. *Id.* Szehinskyj argued that the legislative history of the Holtzman Amendment showed that it had a different meaning than the DPA despite using the same language ("assisted in persecution"). *Id.* at 255-56. We stated that "[t]he law is what Congress enacts, not what its members say on the floor." *Id.* at 256.

We showed that Szehinskyj had selectively chosen comments from the floor debate that supported his argument. *Id.* at 256-60. We also showed that the floor debate as a whole supported the plain meaning of the statute, which was controlling in any case. *Id.* Our consideration of legislative history illustrated "the perils of appealing to [selected comments from the floor debate] as a guide to statutory meaning;" we rejected Szehinskyj's argument largely because "the statutory language is not ambiguous, and is contrary to [his] interpretation." *Id.* at 256. Therefore, Geiser is not on solid ground when he reads *Szehinskyj II* as a statement by this Court that legislative history should be considered at *Chevron* step one.

11

In sum, the current state of Supreme Court and Third Circuit jurisprudence demonstrates that legislative history should not be considered at *Chevron* step one. At step one, a court "must ask . . . whether Congress has directly spoken to the precise question at issue." *Chen*, 381 F.3d at 224 (internal quotation marks and citations omitted). We determine whether Congress has "unambiguously expressed [its] intent," *id.*, by looking at the "plain" and "literal" language of the statute, *Zuni Pub. Sch. Dist.*, 127 S. Ct. at 1543.

C. Application of *Chevron* Step One Analysis to the RRA

The District Court determined, in its *Chevron* step one analysis, that the meaning of RRA § 14(a) ("personally advocated or assisted in the persecution of any person or group of persons because of race, religion, or national origin") was not ambiguous and referred to former concentration camp guards. Therefore, the District Court did not proceed to *Chevron* step two, stating that it did not "reach Geiser's contention that the State Department had in fact adopted a policy of granting RRA visas to former Nazi concentration camp guards who were not war criminals."

Leaving aside the legislative history, which we have shown to be irrelevant at *Chevron* step one, Geiser argues that the text and structure of the RRA are ambiguous.

1. Textual Ambiguity in the RRA

Geiser argues that RRA § 14(a) is silent as to the meaning of the term "persecution," and that the definition of

"persecution" is therefore ambiguous. He cites *Chen*, 381 F.3d 221, to support this proposition. Geiser does not argue that the RRA's use of the word "personally" is ambiguous, but we will address this question as well in order to complete the *Chevron* step one textual analysis. We conclude that the District Court correctly found that there is no textual ambiguity in the RRA.

a. Ambiguity in the Term "Persecution"

The RRA does not define "persecution." RRA § 2 ("Definitions" section, defining "refugee," "escapee," "German expellee," and "Administrator"). However, statutory silence does not prove that a term is ambiguous. *Appalachian States Low-Level Radioactive Waste Comm'n v. Pena*, 126 F.3d 193, 197-98 (3d Cir. 1997) (concluding that a statutory term was unambiguous, although it was not defined). When determining a statute's plain meaning, our starting point is "the ordinary meaning of the words used." *Id*. at 197. We refer to standard reference works such as legal and general dictionaries in order to ascertain the ordinary meaning of words. *Id*. (citing Black's Law Dictionary, Webster's Ninth New Collegiate Dictionary, and Webster's Third New International Dictionary).

Webster's second definition of "persecute" is: "to harass in a manner to injure, grieve, or afflict [usually] because of some difference of outlook or opinion[;] set upon with cruelty or malignity[;] . . . to cause to suffer or put to death because of

13

belief (as in a religion) . . . ."[1]  Webster's Third New International Dictionary 1685 (1981).  Black's defines "persecution" as:  "Violent, cruel, and oppressive treatment directed toward a person or group of persons because of their race, religion, sexual orientation, politics, or other beliefs." Black's Law Dictionary 1178 (8th ed. 2004).

In a case involving the denaturalization of a former Nazi, we defined "persecution" in a manner that is substantively identical to these definitions.  *United States v. Koreh*, 59 F.3d 431, 440 (3d Cir. 1995).  We said that persecution is "the infliction of sufferings, harm, or death on those who differ . . . in a way regarded as offensive or meriting extirpation[;] a campaign having for its object the subjugation or extirpation of the adherents of a religion."  *Id.* (internal quotation marks and citations omitted).

Under these definitions, the experiences of prisoners at Nazi concentration camps fit squarely within the plain meaning of "persecution."  Thus, the meaning of "persecution" is not ambiguous, even though the statute does not define the term. Indeed, Geiser concedes that Sachsenhausen and Buchenwald were "places of persecution."  This admission forecloses his argument that "persecution" is an ambiguous term in the context of this case, because even if it is, he agrees that the

---

[1]The first definition, which is not applicable in this case, is: "to follow with the intent of killing, capturing, or harming . . . ."  Webster's Third New International Dictionary 1685 (1981).

14

concentration camps where he was a guard were places of persecution.

Geiser nevertheless argues that *Chen* demonstrates that the term "persecution" is ambiguous. In *Chen*, we considered which individuals are entitled to refugee status based on past experiences of forced abortion and sterilization. 381 F.3d at 223. According to a 1996 statute, coercive population control programs constitute persecution. *Id.* at 224-25. The BIA interpreted the statute to allow women affected by those programs, as well as their husbands, to make claims of persecution. *Id.* at 227. Chen argued that the definition of "persecution" should be expanded to include the fiancé of a woman who had experienced forcible abortion or sterilization, but we disagreed. *Id.* at 229. In the course of our analysis, we made the following point, upon which Geiser relies:

> "[W]ith the exception of forced abortions and sterilizations, the concept of 'persecution' is left completely undefined. We infer from Congress's use of this ambiguous term an intent to delegate interpretive authority to the agency, including the ability to decide, within a reasonable range, the precise contours of its meaning."

*Id.* at 232. It is important to note that in *Chen*, we spoke of the agency's authorization to regulate within the "reasonable range" specified by the statutory language. *Id.* We reiterated this point later in the opinion:

15

> "[T]here is no indication that Congress intended to put limits on the meaning of the term 'persecution' beyond those imposed by the normal understanding of the word. *Matter of Acosta*, 19 I&N Dec. 211, at 223 (BIA 1985). ('Congress chose not to define the word "persecution" . . . because the meaning of the word was understood to be well established by administrative and court precedents.')."

*Id.* at 233.

In *Chen*, the petitioner was attempting to show that the concept of "persecution" should be expanded to include the fiancés of women who were victims of coercive population control programs. *Id.* at 223. It was logical to discuss the ambiguity in a term like "persecution," which in the context of *Chen* applied to some individuals and not others. Geiser's case, on the other hand, does not stretch the boundaries of the concept of "persecution." What occurred in Nazi concentration camps rests within the plain meaning of the word. Thus, *Chen*'s discussion of the ambiguity of the term "persecution" is inapplicable to the concentration camp context.

In *Fedorenko*, the Supreme Court recognized that persecution has a basically unambiguous meaning, but potentially ambiguous boundaries. 449 U.S. at 511 n.3. *Fedorenko* parallels Geiser's case to a large extent, except that Fedorenko obtained his visa under the DPA rather than the RRA. *Id.* at 496-97. The District Court refused to denaturalize Fedorenko because it found that he had not voluntarily assisted

16

in persecution. *Id.* at 511 n.33. The District Court read this voluntariness requirement into the statute because it believed that otherwise, it would be constrained to denaturalize Jewish survivors of Treblinka who had involuntarily "assisted . . . in persecution" by, for example, cutting other prisoners' hair before their execution. *Id.*

The Supreme Court laid to rest the District Court's fears by pointing out that the term "persecution" can be ambiguous. *Id.* at 512 n.34. The Court stated that "an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians." *Id.* In other words, "persecution" is ambiguous when applied to a prisoner forced to assist in concentration camp operations, but it is not ambiguous when applied to an armed camp guard. *Id.* On the basis of this reasoning, the Supreme Court concluded that Fedorenko's citizenship must be revoked. *Id.* at 518.

Thus, the Supreme Court and this Court have both acknowledged that the term "persecution" has gray boundaries where ambiguity may legitimately be found. *Id.*; *Chen*, 381 F.3d at 232. However, these cases also recognize that certain conduct (guarding a concentration camp or forcing a woman to undergo an abortion) falls squarely within the definition of "persecution." Geiser's case presents an example of such conduct.[2] It cannot

---

[2]Geiser's Answer to the Government's Complaint denies "that [he] personally assisted the Nazi government . . . in persecuting any persons . . . . To the contrary, to the limited

17

be rationally argued that prisoners at Sachsenhausen and Buchenwald were not persecuted within the plain meaning of that term. Therefore, the text of the RRA is not ambiguous due to the use of the term "persecution."

b. Ambiguity in the Term "Personally"

The Supreme Court and this Court have held that according to the plain meaning of the DPA, any armed concentration camp guard "advocated or assisted in persecution." *Fedorenko*, 449 U.S. at 509 ("[D]isclosure of the true facts about petitioner's service as an armed guard at Treblinka would, as a matter of law, have made him ineligible for a visa under the DPA."); *Szehinskyj I*, 277 F.3d at 339 ("It is clear that personal participation in atrocities is not required for one to have assisted in persecution-being an armed concentration camp guard is sufficient." (citing *Fedorenko*, 449 U.S. at 512)).

Since these cases establish that armed concentration camp guards "advocated or assisted in persecution," we must determine whether the RRA's inclusion of the word "personally" (which did not appear in the DPA) requires a

extent possible in the context of a brutal military organization, [Geiser] attempted to aid and assist [the] victims of persecution." However, service as an armed concentration camp guard, without further participation in atrocities, is sufficient to constitute assistance in persecution. *Fedorenko v. United States*, 449 U.S. 490, 512 n.34 (1981).

18

different result.[3]  This is an issue of first impression for our Court.

As required by *Chevron* step one, we must decide whether the term "personally" in the text of RRA § 14(a) is ambiguous.  We must determine whether Congress has "directly spoken to the precise question at issue," *Chen*, 381 F.3d at 224, by looking at the "plain" and "literal" language of the statute, *Zuni Pub. Sch. Dist.*, 127 S. Ct. at 1543.  The precise question at issue is whether an armed concentration camp guard who is not shown to have committed atrocities nevertheless "personally advocated or assisted in . . . persecution."  RRA § 14(a).

Webster's defines "personal" as:  "[O]f or relating to a particular person . . . [;] done in person without the intervention of another . . . ."  Webster's Third New International Dictionary 1686 (1981).  It defines "personally" as:  "[S]o as to be personal[;] in a personal manner; . . . as oneself[;] on or for one's own part."  *Id.* at 1687.  Black's defines "personal" as: "Of or affecting a person."  Black's Law Dictionary 1179 (8th ed. 2004).  Therefore, the plain meaning of "personally advocated or assisted in the persecution of any person" is that an

---

[3]The DPA provided that visas would not be issued to anyone "who advocated or assisted in the persecution of any person."  *United States v. Szehinskyj* (*Szehinskyj I*), 277 F.3d 331, 334 (3d Cir. 2002).  The RRA provided that visas would not be issued to "any person who personally advocated or assisted in the persecution of any person or group of persons."  RRA § 14(a).

19

individual, by his own actions performed in person, advocated or assisted in persecution.

Geiser's conduct as an SS guard fits the plain meaning of "personally advocated or assisted in . . . persecution." Geiser stood watch at the perimeter of the concentration camps with instructions to fire his rifle if a prisoner tried to escape. Thus, his personal actions assisted in keeping the prisoners confined in the camps where they were persecuted. In addition, he marched prisoners to and from their work sites, and these personal actions assisted in coercing the prisoners into performing forced labor.

We find support for our conclusion in the opinions of our sister Courts of Appeals, which have concluded that "personally advocated and assisted in . . . persecution" describes the actions of any concentration camp guard. In *United States v. Hansl*, the Court of Appeals for the Eighth Circuit concluded that:

> "Hansl's admitted conduct as a member of the Death's Head Battalion, guarding the perimeters of concentration camps while armed, issuing orders, and threatening to shoot anyone who attempted to leave a concentration camp is more than sufficient to meet the common definition of personally assisting in the persecution of a group of persons based on their race, religion, or national origin."

439 F.3d 850, 854 (8th Cir. 2006). The Court of Appeals for the Seventh Circuit reached the same result in *United States v.*

20

*Kumpf*: "While the precise parameters of personal assistance under the [RRA] have not been delineated by the courts, Kumpf's own actions [as a concentration camp guard] clearly constitute personal assistance in persecution." 438 F.3d 785, 790 (7th Cir. 2006).

We conclude, as have other Courts of Appeals, that according to the plain meaning of the RRA, concentration camp guards "personally advocated or assisted in . . . persecution." RRA § 14(a). Although Geiser attempts to argue that the RRA is textually ambiguous at *Chevron* step one, the meaning of the statute is clear. Therefore, the District Court correctly refused to proceed to *Chevron* step two.

### 2. Structural Ambiguity in the RRA

Geiser argues that the structure of the RRA demonstrates that the statute is ambiguous. Statutory structure is properly considered under *Chevron* step one. *Zheng*, 422 F.3d at 115-16. However, the structure of the RRA does not create ambiguity as to its meaning.

The RRA provides that individuals must establish "eligibility for a visa and . . . admissibility into the United States under this Act and under the immigration laws and regulations." RRA § 11(c). Thus, any individual who received a visa under the RRA was also subject to the requirements of the Immigration and Nationality Act of 1952 ("INA"). Section 104 of the INA provided that aliens should be excluded if, among other things, they had been members of a "totalitarian party" or

21

would engage in "activity subversive to the national security." INA § 212(a)(28), (29).

The State Department issued regulations interpreting the INA, among them 22 C.F.R. § 42.42. This regulation provided that an alien was inadmissible if he "was guilty of, or . . . advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of a power which was at war with the United States during World War II." 22 C.F.R. § 42.42(j)(2).

Geiser posits that the admissibility of former concentration camp guards could be determined by looking at RRA § 14, by looking at 22 C.F.R. § 42.42(j) and its interpretive materials, or by looking at the State Department's interpretations of the immigration laws as a whole. He argues that because there are multiple ways to interpret the RRA's structure, the statute is ambiguous.

These three interpretations of the structure of the RRA are unconvincing. It is not clear how the admissibility of former camp guards could be governed only by the RRA when the RRA specifically incorporates the requirements of the INA. Conversely, it would not make sense for admissibility to be governed only by the INA and its associated regulations when Geiser's visa was issued under the RRA.

Geiser's proffered interpretations of the RRA's structure do not include the most natural reading of the statute, which is that the word "and" is used in its plain conjunctive sense. *Reese Bros., Inc. v. United States*, 447 F.3d 229, 236 (3d Cir. 2006)

22

("The usual meaning of the word 'and' . . . is conjunctive, and unless the context dictates otherwise, the 'and' is presumed to be used in its ordinary sense.") (internal quotation marks and citation omitted). RRA § 11(c) states that applicants must demonstrate their eligibility "under this Act and under the immigration laws and regulations." Nothing in this context dictates that we should abandon our usual presumption about the meaning of "and." In RRA § 11(c), "and" signifies that applicants such as Geiser had to meet two sets of requirements: those of the INA (and its associated regulations) and those of the RRA. Thus, Geiser's argument – that the RRA is structurally ambiguous – fails.[4]

Despite Geiser's effort to unearth ambiguity in the structure of the RRA, none exists. The District Court properly declined to proceed to *Chevron* step two in order to discern the meaning of the RRA.

---

[4]In cases involving former concentration camp guards, the Courts of Appeals for the Seventh and Eighth Circuits have also interpreted RRA § 11(c) to use "and" in its ordinary conjunctive sense. Each of those courts analyzed the former guard's admissibility under the RRA, without reference to the INA or its attendant regulations. *United States v. Hansl*, 439 F.3d 850 (8th Cir. 2006); *United States v. Kumpf*, 438 F.3d 785 (7th Cir. 2006). If the word "and" carries its plain conjunctive meaning, the government only needs to show that an individual failed to meet the requirements of the RRA or the INA, because an individual who fails to meet either set of requirements does not qualify under the RRA "and" the INA.

## III. CONCLUSION

We conclude that the District Court properly granted the Government's motion for summary judgment. There is neither textual nor structural ambiguity in RRA § 14(a), so *Chevron* step two analysis is unnecessary. As an armed concentration camp guard in World War II, Geiser "personally advocated or assisted in the persecution of [a] . . . group of persons because of race, religion, or national origin." RRA § 14(a). Therefore, we will affirm the District Court's order granting the Government's motion for summary judgment and revoking Geiser's citizenship.

24