**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2409
_____

COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF PUBLIC WELFARE,
                                        Appellant.

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES;
SECRETARY OF THE U.S. DEPARTMENT OF HEALTH
AND
HUMAN SERVICES, in his official capacity.
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 1:08-cv-00791)
District Judge: Honorable Yvette Kane
_____

Submitted Under Third Circuit LAR 34.1(a)
January 13, 2011

Before:    SCIRICA, BARRY and VANASKIE, *Circuit Judges.*

(Filed June 13, 2011)

Jason W. Manne, Esq.
Office of General Counsel
Department of Public Welfare
300 Liberty Avenue
303 State Office Building
Pittsburgh, PA 15222-0000
           *Counsel for Appellant*


Tony West, Assistant Attorney General
        (*Did not enter an appearance*)
William Kanter, Esq.
Peter R. Maier, Esq.
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0000
           *Counsel for Appellee*
           _____

OPINION OF THE COURT
           _____

VANASKIE, *Circuit Judge*.

The Pennsylvania Department of Public Welfare ("Pennsylvania") challenges a decision disallowing federal reimbursement of occupancy costs incurred in operating

2

community residential facilities for the developmentally disabled. The District Court, on cross-motions for summary judgment, affirmed the Secretary of Health and Human Services' ("HHS") determination that reimbursement of occupancy expenses is precluded by the statutory exclusion of room and board set forth in 42 U.S.C. § 1396n(c)(1). Discerning no error in the District Court's well-reasoned decision, we will affirm.

I.

Pennsylvania, like every other state, participates in the Medicaid Program, which was established in 1965 under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* Medicaid is "a cooperative, jointly funded, federal-state program to financially assist low income persons in securing medical care." *Klein v. Califano*, 586 F.2d 250, 253 (3d Cir. 1978). Under Medicaid, the federal government reimburses between 50% and 83% of state costs for patient care on behalf of eligible low-income individuals. Medicaid is administered by HHS through its Centers for Medicare and Medicaid Services ("CMS").

As part of Medicaid, states are eligible to receive federal financial participation to assist with medical assistance expenditures for eligible individuals in hospitals, nursing facilities, and intermediate care facilities for the mentally retarded. Federal financial participation was extended in 1981 to cover developmentally disabled individuals receiving care in home- and community-based settings. *See* 42 U.S.C. § 1396n(c). Pursuant to 42 U.S.C. § 1396n(c)(1), states can opt-in to this coverage program by obtaining a "waiver" of other provisions of the Medicaid Statute. Section 1396n(c)(1), in pertinent part, provides:

3

The Secretary may by waiver provide that a State plan approved under this subchapter may include as "medical assistance" under such plan payment for part or all of the cost of home or community-based services (*other than room and board*) approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan.

42 U.S.C. § 1396n(c)(1) (emphasis added).

HHS has issued regulations implementing the exclusion of expenditures of federal funds for "room and board." [1] *See* 42 C.F.R. § 441.310(a)(2). The State Medicaid Manual, which serves as the official HHS interpretation of the law and regulations, contains the following explanatory statement:

Except for respite care furnished in a State approved facility that is not [a] private residence (see item 4), [federal financial participation] is not available for <u>room and board</u> of the recipient as part of a home and community-based service. Board means three

---

[1] There are exceptions to this rule with regard to personal caregivers and respite costs that are not relevant here.

> meals a day or any other full nutritional regimen. Room means hotel or shelter type expenses including all property related costs such as rental or purchase of real estate and furnishings, maintenance, utilities, and related administrative services.

(A. 112a.)

Pennsylvania obtained a home and community based service ("HCBS") waiver in 2001. The waiver, which was renewed in 2006, authorized reimbursement of state expenses for "habilation services" for developmentally disabled individuals in home- and community-based treatment settings.[2]

Habilitation services are defined by statute as "services designed to assist individuals in acquiring, retaining, and improving the self-help, socialization, and adaptive skills necessary to reside successfully in home and community based settings." 42 U.S.C. § 1396n(c)(5)(A). The waiver granted to Pennsylvania defined these community habilitation services as follows:

---

[2]Pennsylvania provides habilitation services to developmentally disabled individuals in four living arrangements: intermediate care facilities for the mentally retarded ("ICF/MRs"), community homes (also called "community residential facilities"), family living homes, and supported independent living arrangements. Of these, funding to the nearly 2,200 non-profit or county-owned community residential facilities across the state is at issue here.

> Community Habilitation means services designed to assist individuals in acquiring, retaining, and improving the self-help, socialization, and adaptive skills necessary to reside successfully in home and community-based settings. Habilitation may be provided up to 24 hours a day based on the needs of the individual receiving services. Included are provider training costs, supervisory costs, purchased personnel costs, and costs of necessary supplies, equipment and adaptive appliances. Services may be provided by a qualified family member or relative, independent contractor, or services agency.

(A. 62a.)

Pennsylvania provides habilitation services in nearly 2,200 non-profit or county-owned community residential facilities. From 2001 through part of 2006, Pennsylvania did not seek federal reimbursement for occupancy costs for Medicaid recipients living in such facilities. Instead, Pennsylvania paid for residents' room and board in these facilities using a combination of state funds and the residents' Supplemental Security Income.

On March 1, 2006, Pennsylvania began claiming a portion of occupancy costs as reimbursable "habilitation services."[3] Specifically, Pennsylvania claimed that 54.1667%

---

[3] Beginning in late 2005, Pennsylvania employed the consulting firm MAXIMUS to maximize the Medicaid funding it was receiving from the federal government. The

6

of its occupancy costs, including rent, utilities, interest, depreciation, building insurance, housekeeping, building repairs, maintenance and renovation, and furnishings and equipment were not, in fact, "room" costs, but were "habilitation costs." This claim was based on the fact that residents were engaged in "waiver services" on the premises for 13 hours in a typical 24-hour day, and, consequently, room costs for this period actually supported habilitation.

CMS denied the request for inclusion of occupancy costs by a letter dated July 5, 2006, determining that the costs constituted "room and board" expenses and were therefore non-reimbursable under the statute and the State Medicaid Manual. The letter expressly disapproved Pennsylvania's approach, noting that "[Section 4442.3.B.8 of the State Medicaid Manual] requires the clear differentiation between the services covered by the HCBS waiver that are provided in the residence and the cost of room and board, which by law cannot be covered." (A. 80a.) CMS issued a letter dated August 17, 2006, stating that the State could not include the $50,939,457 in occupancy costs in its HCBS Medicaid claims. An additional $9,997,220 was subsequently disallowed. On June 21, 2007, CMS formally disallowed all of Pennsylvania's claims for occupancy costs.

Pennsylvania appealed the disallowance to the HHS Departmental Appeals Board ("DAB"), which upheld the disallowance on February 6, 2008. The DAB explained:

> [T]he costs that Pennsylvania is calling "occupancy" (or "facility") costs today are the

claim for occupancy costs appears to have been developed from MAXIMUS' analysis and advice.

7

same as the costs that Pennsylvania previously has treated as room costs. They have the same component parts: rent, utilities, interest, depreciation, building insurance, housekeeping, building repairs and maintenance, building renovations, furnishings and equipment, and repairs of furnishings and equipment. For all intents and purposes, Pennsylvania's occupancy costs in community residential facilities are room costs; they are the costs of providing housing to the Medicaid recipients who live there.

(A. 37a-38a.)

Pennsylvania next brought suit in the U.S. District Court for the Middle District of Pennsylvania, alleging that the DAB's decision violated the Administrative Procedure Act as an action that was arbitrary, capricious, an abuse of discretion, or otherwise unlawful. The District Court awarded summary judgment to HHS on March 31, 2010. The court initially concluded that "[room and board] unambiguously means the provision of living space and meals." (A. 14a.) The court further found that, even if the term "room" was ambiguous, under the deferential *Chevron* standard of review, the DAB's construction of the statutory term "room and board" was reasonable, supported by the language of the State Medicaid Manual, and entitled to deference.

8

II.

In this appeal from the decision of an administrative board,[4] "we apply *de novo* review to the district court's ruling, and in turn apply the applicable standard of review to the underlying agency decision." *Cyberworld Enter. Techs., Inc., v. Napolitano*, 602 F.3d 189, 195-96 (3d Cir. 2010). Under the Administrative Procedure Act, we must determine whether the Board's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Our review of whether an administrative board committed an abuse of discretion is governed by *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Under *Chevron*, we follow a two-step analysis. First, we determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has, we must effectuate the intent of Congress. If not, we must determine whether the agency's construction of the statute is "permissible." *Id.* at 843. Notably, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11.

Our first inquiry is whether Congress has directly spoken to the issue of whether the "room and board" exclusion encompasses the "occupancy costs" which Pennsylvania seeks to claim. "We determine whether Congress has unambiguously expressed [its] intent by looking

---

[4] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

9

at the plain and literal language of the statute." *United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008) (internal quotation marks and citations omitted). "When determining a statute's plain meaning, our starting point is the ordinary meaning of the words used. We refer to standard reference works such as legal and general dictionaries in order to ascertain the ordinary meaning of words." *Id.* (internal quotation marks and citations omitted).

Webster's defines "room and board" as "lodging and food usu[ally] specifically earned or furnished." Webster's Third New International Dictionary 1972 (1993). The applicable definition of "room" is given as "lodging consisting of a room usu[ally] specifically earned or furnished," *id.* at 1972, and the applicable definition of "board" is given as "food in the form of daily meals often provided as payment for services," *id.* at 243. The Oxford English Dictionary, which dates the term back at least to the year 1795, defines "room and board" as "accommodation and meals," and compares it to the phrase "bed and board," meaning "entertainment with lodging and food," which has been in existence since at least circa 1403. *See Room, n.* and *Bed, n.*, Oxford English Dictionary (2d ed. 1989), *online version available at* http://www.oed.com/.[5]

The plain meaning of "room and board," therefore, encompasses not mere "living space," but "lodging" that has been especially furnished together with food. Lodging is defined as "a place to live" and "a room or rooms in the house of another used as a place of residence." Webster's Third

---

[5] Black's Law Dictionary does not define the term.

10

New International Dictionary 1329 (1993). The original phrase, "bed and board," encompassed the furnishing of entertainment as part of one's lodging. Indeed, as HHS points out, "the rent paid by the lodger at the boarding house of yesteryear entitled him to his seat at the dinner table and a chair in the parlor after dinner, not just the room where he slept." (Appellee's Br. at 26.) The plain meaning of the term has never been limited to the actual hours occupied by sleeping and eating, but extends to the activities or entertainments incidental to the provision of lodging.[6]

Because the plain meaning of the statute leaves no doubt that the costs at issue here were meant to be excluded from reimbursement, we find that the District Court did not err.

Even if the definition of "room and board" were deemed ambiguous, however, we would still find that the DAB did not abuse its discretion. Under the second prong of *Chevron*, if the agency's construction of the term "room and board" is permissible, we must allow it to stand. A "'reasonable interpretation'" of the statute is permissible. *Pareja v. Attorney General*, 615 F.3d 180, 193 (3d Cir. 2010) (quoting *Chevron*, 467 U.S. at 844). Indeed, in this Circuit,

---

[6] Even Pennsylvania's own Administrative Code defines "room" as "[t]he client's share of lodging costs, utility costs – for example, electricity, heating, water and sewage – and annual upkeep costs of the community residential mental retardation facility – for example, trash collection, general maintenance including necessary repairs and renovation costs." 55 Pa. Code § 6200.3. It defines "board" as "[t]he client's share of his food and food preparation costs." *Id.*

11

statutory construction has been deemed permissible when it "is based on an accepted dictionary definition of the term . . . and does not impermissibly strain the plain language of the regulation." *Secretary of Labor v. Beverly Healthcare-Hillview*, 541 F.3d 193, 200 (3d Cir. 2008).

Here, the DAB construed the word "room" to include what Pennsylvania called "occupancy costs" because "[t]hey have the same component parts: rent, utilities, interest, depreciation, building insurance, housekeeping, building repairs and maintenance, building renovations, furnishings and equipment, and repairs of furnishings and equipment." (A. 37a.) The DAB added that these costs "are the costs of providing housing to the Medicaid recipients who live there." (*Id.* at 38a.) The DAB further distinguished "room" costs from reimbursable "habilitation services" costs, such as "provider training costs, supervisory costs, purchased personnel costs, and costs of necessary supplies." (*Id.*)

The interpretation given to the phrase "room and board" is plainly reasonable. It is consistent with the dictionary definitions mentioned above. It is also consistent with the congressional determination to limit reimbursement to habilitation "services" exclusive of room and board. Accordingly, the District Court did not err in according deference to the HHS interpretation.[7]

---

[7] Pennsylvania argues that the State Medicaid Manual authorizes it to "allocate" its room costs between reimbursable and non-reimbursable expenses. According to Pennsylvania, the State Medicaid Manual, which contains "[i]nstructions [which] are official interpretations of the law and regulations, and, as such, are binding on Medicaid State

12

Pennsylvania argues, however, that it is inappropriate to analyze this matter under the second step of *Chevron* because this issue concerns a federal grant to the states, which essentially involves a contract between Congress and the states. Pennsylvania argues that "[t]he legitimacy of Congress' power to legislate under the Spending Clause rests upon whether States voluntarily and knowingly accept the terms of the contract," that "[s]tates cannot accept terms of which they are unaware or unable to ascertain," and that "obligations under Federal grants generally should be judged by reference to the law in effect when the grants were made." (Appellant's Br. at 15-16 (internal citations and quotation marks omitted).) Accordingly, Pennsylvania claims that

agencies," State Medicaid Manual, Foreword, quoted in *Sai Kwan Wong v. Doar*, 571 F.3d 247, 253 n.6 (2d Cir. 2009), states that "[t]here must also be a detailed cost allocation strategy provided as part of the waiver request to explain how the cost of waiver services in the residential setting will be determined and segregated from ineligible waiver costs." State Medicaid Manual § 4442.3(B)(8) (reproduced in A. 111a-12a). Pennsylvania concludes that it is permitted to allocate "occupancy costs" between the permitted objective of habilitation services and the unpermitted objective of room and board, and this triggers the application of Office of Management and Budget Circular No. A-87 ("OMB A-87"), which governs the allocation process. OMB-87, however, speaks only to "allowable costs." *See* Office of Mgmt. & Budget, Executive Office of the President, OMB Cir. No. A-87, Revised (2004). Because room costs are, by statute, not allowable, OMB-87 does not apply here. The State Medicaid Manual does not generally enable ineligible costs to be bifurcated, as Pennsylvania now proposes.

13

because the definition of "room" did not definitely exclude what it now calls "occupancy costs," to so find now would force Pennsylvania to accept a term which was not ascertainable at the time of agreement. To support its argument, Pennsylvania cites *Bennett v. New Jersey*, 470 U.S. 632 (1985), and *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985).

These cases are inapposite. *Bennett v. New Jersey* dealt with whether states were obligated to repay grants issued under Title I of the Elementary and Secondary Education Act. In that case, New Jersey was the recipient of Title I grant monies which it distributed to numerous school districts. New Jersey argued that substantive statutory changes made by Congress should retroactively govern the court's determination of whether New Jersey's distribution was in violation of Title I. The Supreme Court disagreed, finding that "changes in substantive requirements for federal grants should not be presumed to operate retroactively. Moreover, practical considerations related to the administration of federal grant programs imply that obligations generally should be determined by reference to the law in effect when the grants were made." *New Jersey*, 470 U.S. at 638.

*Bennett v. Kentucky Department of Education*, a companion case to *Bennett v. New Jersey*, also addressed a potential misuse of Title I funds. The Court determined that Kentucky had used Title I funds to supplant, rather than supplement, existing educational funding. *Kentucky*, 470 U.S. at 660-61. The Court expressed concern about a requirement that the funds be repaid, however, noting that "a demand for repayment is more in the nature of an effort to

14

collect upon a debt than a penal sanction." *Id.* at 662-63. While the Court agreed that "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds," *id.* at 665-66 (internal quotation marks omitted), it found that "[t]here was no ambiguity with respect to [the] condition" imposed, *id.* at 666. The Court further observed that "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Id.* at 669.

Here, we do not deal at all with the retroactivity of statutory amendments or the issue of retroactive punitive sanctions. On the contrary, the case before us involves a consistent interpretation of a statutory provision that has been applied throughout Pennsylvania's participation in the waiver program. Indeed, prior to March 1, 2006, Pennsylvania's reimbursement applications excluded the very occupancy costs to which it now claims entitlement. Thus, this case is unlike *Bennett v. New Jersey*, in which the Court recognized the concern that arises when a party had "a right that had matured or become unconditional." 470 U.S. at 639 (internal quotation marks omitted). Moreover, the interpretation of the room and board exclusion is by no means as uncertain as that of the provisions of Title I at issue in the *Bennett* decisions, which were the focus of considerable debate before Title I was updated and clarified. *See Bennett v. Ky. Dep't of Educ.*, 470 U.S. at 667-69 (reviewing history of Title I from its 1965 enactment, noting "uncertainty" compounded by selective enforcement and 1978 statutory amendments based upon extensive study of inconsistent administration of statute).

15

Thus, Pennsylvania's argument that we should not apply *Chevron* here is unavailing.

### III.

For the foregoing reasons, we will affirm the judgment of the District Court.