**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1239
_____

JEFFREY BONKOWSKI,
Appellant

v.

OBERG INDUSTRIES, INC.
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-12-cv-00812)
District Judge: Hon. Joy Flowers Conti
_____

Argued October 23, 2014

BEFORE: FUENTES, GREENBERG AND COWEN, <u>Circuit
Judges</u>

(Filed: May 22, 2015)

_____

OPINION OF THE COURT
_____

Tiffany R. Waskowicz, Esq. (Argued)
Joshua M. Bloom & Associates
310 Grant Street, Suite 3204
Pittsburgh, PA 15219

      Counsel for Appellant

Paul S. Mazeski, Esq.
Erin J. McLaughlin, Esq. (Argued)
Buchanan Ingersoll & Rooney
301 Grant Street
One Oxford Centre, 20th Floor
Pittsburgh, PA 15219

      Counsel for Appellee

COWEN, Circuit Judge.

Plaintiff Jeffrey Bonkowski appeals from the order of the United States District Court for the Western District of Pennsylvania granting the summary judgment motion filed by Defendant Oberg Industries, Inc. ("Oberg") with respect to his claims under the Family and Medical Leave Act ("FMLA"). In this appeal, the Court must interpret a Department of Labor ("DOL") regulation—which states in relevant part that "[i]npatient care means an overnight stay in a hospital, hospice, or residential medical care facility." We conclude

2

that "an overnight stay" means a stay in a hospital, hospice, or residential medical care facility for a substantial period of time from one calendar day to the next calendar day as measured by the individual's time of admission and his or her time of discharge. Because Bonkowski was admitted and discharged on the same calendar day, we will affirm the District Court's order.

I.

Bonkowski worked for Oberg (a manufacturer of precision components and tooling) as a wirecut operator and machinist. He has a number of health conditions, including an aortic bicuspid (i.e., he has two heart valves as opposed to three) and diabetes. He was diagnosed with a possible aortic aneurysm after he fainted in the woods in May 2010. In addition, Bonkowski's colon was removed.

On November 14, 2011, Bonkowski met with two supervisors (David Santi and Jeffrey Ambrose) in order to discuss his recent suspension for allegedly sleeping on the job. According to Bonkowski, he began to experience shortness of breath, chest pain, and dizziness, and Santi and Ambrose gave him permission to go home and continue their meeting the next day. He clocked out at 5:18 p.m. and went home to try to slow down his breathing and heart rate. Lisa Bonkowski testified at her deposition that her husband looked as "white as a ghost" and was clutching his chest. (A345.) Over the next few hours, Bonkowski unsuccessfully tried to slow down his heartbeat and catch his breath.

Shortly after 11 p.m., Bonkowski's wife drove him to

Butler Memorial Hospital. It appears that the couple arrived at the hospital shortly before midnight. At his deposition, Bonkowski stated that "I just know that I arrived earlier, I remember just—when they were wheeling me in, I see a clock right in front of me and it was a few minutes before 12:00." (A279.) He was then admitted shortly after midnight on November 15, 2011.

Bonkowski underwent comprehensive testing at the hospital. His wife was initially informed that he may need open heart surgery. However, the tests did not find any complications with his heart condition or diabetes. Bonkowski accordingly was released from Butler Memorial Hospital in the early evening hours of November 15, 2011. He obtained a doctor's note stating that "Jeff was hospitalized and is excused from work." (A361.) When he was discharged from the hospital, Bonkowski was instructed to follow up with his primary care physician and cardiologist and to schedule an outpatient echocardiogram. However, no restrictions were placed on his activities.

The record includes two documents from Butler Memorial Hospital: (1) the "Discharged Inpatient Report" (A353-A359); and (2) the "Discharge Instructions" (A363). Summarizing the test results, the Discharged Inpatient Report identified the date of "Reg" as "11/15/11" and the date of "Disch." as "11/15/11." (A353-A359.) Likewise, the Discharge Instructions indicated that "11/15/11" was the "ADM-DT" and that Bonkowski was discharged on "11/15/11." (A363.)

On November 16, 2011, Lou Proviano, the head of

Oberg's human resources department, notified Bonkowski that his employment was terminated because he had walked off the job on November 14, 2011. In his subsequent deposition testimony, Proviano characterized Bonkowski's time in the hospital as an "overnight situation." (See A292 ("It was a voicemail—it was a voicemail message that indicated that she was trying to get FMLA documentation from Jeff Ambrose, and the overnight situation usually doesn't warrant an FMLA document at the time.").)

Bonkowski filed the current FMLA action against Oberg. He alleged two causes of action under the FMLA: (1) Oberg retaliated against him for exercising his FMLA rights; and (2) Oberg interfered with his FMLA rights.

After the parties completed discovery, Oberg filed a motion for summary judgment. In a January 17, 2014 order, the District Court granted Oberg's motion, entering judgment in favor of Oberg and against Bonkowski. In its accompanying memorandum opinion, the District Court determined that "no reasonable jury could find that plaintiff's absence from work on November 15, 2011, was a qualifying absence under the FMLA entitling him to protection from Defendant's interference or retaliation with his FMLA rights." Bonkowski v. Oberg Indus., Inc., 992 F. Supp. 2d 501, 512 (W.D. Pa. 2014). In short, it rejected Bonkowski's retaliation and interference claims because he did not have a "serious health condition" under 29 U.S.C. § 2611(11)(A), i.e., "an illness, injury, impairment, or physical condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility," and therefore was not entitled to leave under the

5

FMLA.

Specifically, the District Court was required to interpret 29 C.F.R. § 825.114, which defines the terms "inpatient care" as "an overnight stay in a hospital, hospice, or residential medical facility, including any period of incapacity as defined in 29 C.F.R. § 825.113(b), or any subsequent treatment in connection with such inpatient care." Oberg asserted that "'an overnight stay in a hospital' means a stay in a hospital from 'one day to the next, measured by the inpatient's date of admission and discharge.'" Bonkowski, 992 F. Supp. 2d at 510 (citation omitted). According to the District Court, "Plaintiff argues that he stayed overnight at the hospital from November 14, 2011, to November 15, 2011, because he arrived at the hospital shortly before midnight and was discharged in the early evening of the following day." Id. (footnote omitted). Finding that the arguments offered by both sides were not sufficient to resolve this issue (and noting that neither the FMLA nor the DOL regulations define the term "overnight"), the District Court turned to dictionary definitions of "overnight," "duration," and "night" (as well as the definition of "night" adopted by the Federal Aviation Administration ("FAA")) to discern the ordinary meaning of § 825.114's "overnight stay" terminology.

The District Court ruled that "Plaintiff can establish he had a qualifying serious medical condition only if he is able to establish he spent the entire 'night' as an inpatient at the hospital'" and that "an 'overnight stay' at a hospital is a stay from sunset on one day to sunrise the next day." Id. at 511. Taking judicial notice of the sunset and sunrise times set out in

6

The Old Farmer's Almanac, the District Court ascertained that, based on Butler Memorial Hospital's zip code, the sun set at 5:02 p.m. on November 14, 2011 and rose at 7:07 a.m. on November 15, 2011. According to the District Court, Bonkowski was required to "put forth evidence that he was in the hospital from November 14, 2011, at 5:02 p.m. until November 15, 2011, at 7:07 a.m. to show his condition qualified as a serious medical condition under the FMLA." Id. He failed to do so:

> The undisputed evidence in this case is that Plaintiff arrived at Butler Memorial Hospital shortly before midnight on November 14, 2011. He was admitted as an inpatient shortly after midnight on November 15, 2011. He remained at the hospital as an inpatient until the evening of November 15, 2011. The undisputed evidence of record shows that plaintiff did not stay overnight as an inpatient in the hospital because he did not arrive at the hospital until shortly before midnight on November 14, 2011, almost seven hours after the sun set that day. Plaintiff, therefore, failed to show that he spent the duration of the night at Butler Memorial Hospital. . .

Id. at 511-12 (citations omitted).

The District Court found it unnecessary to follow the rationale of the Second Circuit's ruling in Estate of Landers v. Leavitt, 545 F.3d 98 (2d Cir. 2008), and thereby conclude that

7

"Plaintiff's arrival at Butler Memorial Hospital did not begin his inpatient stay; rather, plaintiff became an inpatient when he was formally admitted after midnight." Bonkowski, 992 F. Supp. 2d at 510 n.10. "Based upon the plain meaning of the word 'overnight,' even considering the time prior to plaintiff's formal admission, he did not stay overnight at the hospital." Id.

The District Court likewise considered Bonkowski's argument that he stayed overnight at the hospital because Butler Memorial Hospital designated him as an inpatient (and because The Free Dictionary defines an "inpatient" as "'[a] patient who is admitted to a hospital or clinic for treatment that requires at least one overnight stay,'" id. at 509 n.9 (quoting The Free Dictionary, http://www.thefreedictionary.com/inpatient (last visited Jan. 16, 2014))). According to the District Court, his argument lacked merit because "inpatient care" is defined by the regulations as "*an overnight stay*, meaning a plaintiff **must** stay overnight to qualify as receiving in-patient care." Id. Butler Memorial Hospital's designation at best meant that his condition required one overnight stay. It "does not mean that plaintiff *actually* stayed overnight at the hospital, i.e., that he received inpatient care and is qualified for protection under the FMLA." Id.

## II.

Congress enacted the FMLA in 1993 to address problems associated with "inadequate job security for employees who have serious health conditions that prevent

them from working for temporary periods."[1] 29 U.S.C. § 2601(a)(4). The purpose of this statutory scheme is, inter alia, "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity" as well as "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1), (2). It is undisputed that the FMLA constitutes "remedial legislation" that "must be broadly construed in order to give full effect to these purposes." Caprio v. Healthcare Revenue Recovery Grp., LLC, 709 F.3d 142, 148 (3d Cir. 2013) (citations omitted) (discussing Fair Debt Collection Practices Act); see also, e.g., Cobb v. Contract Transport, Inc., 452 F.3d 543, 559

---

[1] The District Court had subject matter jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

This Court exercises plenary review over a district court's order granting a motion for summary judgment, applying the same standard that the district court ought to apply. See, e.g., Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 362 (3d Cir. 2008). As the District Court recognized in its memorandum opinion, Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." We must draw all reasonable inferences in favor of the non-moving party. See, e.g., Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 300 (3d Cir. 2012).

(6th Cir. 2006) ("Finally, the worksite provision of the FMLA is an exclusionary provision in a remedial statute. Following traditional canons of statutory interpretation, remedial statutes should be construed broadly to extend coverage and their exclusions or exceptions should be construed narrowly." (citation omitted)); Stekloff v. St. John's Mercy Health Sys., 218 F.3d 858, 862 (8th Cir. 2000) ("We think, in other words, contrary to the position of St. John's, that the concept of 'serious health condition' was meant to be 'broad,' see S. Rep. No. 103-3, at 28 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 30, and that the FMLA's provisions should be interpreted to effect its remedial purpose. See Hodgens v. General Dynamics Corp., 144 F.3d 151, 164 (1st Cir. 1998)."). However, Congress explained that this purpose should be accomplished "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3).

Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). Additionally, "[it] shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). "The former provision is generally, if imperfectly, referred to as 'interference' whereas the latter is often referred to as 'retaliation.'" Lichtenstein, 691 F.3d at 301 (citing Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005)). In any event, Bonkowski "does not dispute that if he was not qualified for leave under § 2612(a)(1)(D), i.e., if he did not have a serious health condition, his claims fail as a matter of law."

10

Bonkowski, 992 F. Supp. 2d at 509. Specifically, 29 U.S.C. § 2612(a)(1)(D) provides that an eligible employee shall be entitled to a total of twelve workweeks of leave during any 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

29 U.S.C. § 2611(11) states that "[t]he term 'serious health condition' means an illness, injury, impairment, or physical condition that involves **(A)** inpatient care in a hospital, hospice, or residential medical care facility; or **(B)** continuing treatment by a health care provider." In turn, "[t]he FMLA's legislative history noted that '[t]he definition of serious health condition' . . . is broad and intended to cover various types of physical and mental conditions.'" Scamihorn v. Gen. Truck Drivers, 282 F.3d 1078, 1084 (9th Cir. 2002) (quoting S. Rep. No. 103-3, at 28); see also, e.g., Stekloff, 218 F.3d at 862. The DOL promulgated interim regulations in 1993 in order to implement this new statutory scheme. See The Family & Medical Leave Act of 1993, 58 Fed. Reg. 31,794 (June 4, 1993) (interim final rule & request for comments). At the time, the department offered the following explanation of this notion of a "serious health condition":

> The term "serious health condition" is intended to cover conditions or illnesses affecting one's health to the extent that inpatient care is required, or absences are necessary on a recurring basis or for more than a few days for treatment or recovery. Furthermore, the Congressional reports indicate that this term is

11

not intended to cover short-term conditions for which treatment and recovery are very brief, since such conditions would generally be covered by employers' sick leave policies. Examples of a serious health condition cited in the legislative history include heart attacks, heart conditions requiring heart bypass or valve operations, most cancers, back conditions requiring extensive therapy or surgical procedures, strokes, severe respiratory conditions, spinal injuries, appendicitis, pneumonia, emphysema, severe arthritis, severe nervous disorders, injuries caused by serious accidents on or off the job, ongoing pregnancy, severe morning sickness, the need for prenatal care, childbirth and recovery from childbirth.

Id. at 31,799. In the preamble to its 1995 rulemaking promulgating final FMLA regulations, the DOL observed that "[t]his scant statutory definition [of a "serious health condition"] is further clarified by the legislative history." The Family & Medical Leave Act, 60 Fed. Reg. 2180, 2191 (Jan. 6, 1995) (final rule). Specifically, "[t]he congressional reports did indicate that the term was not intended to cover short-term conditions for which treatment and recovery are very brief, as Congress expected that such conditions would be covered by even the most modest of employer sick leave policies." Id. at 2191-92.

The DOL has adopted regulations that define the various terms incorporated into the FMLA's definition of a

12

"serious health condition." Both the parties and the District Court appear to turn to the current version of these DOL regulations, which went into effect on March 8, 2013. The current version of 29 C.F.R. § 825.113, entitled "**Serious health condition**," provides that, "[f]or purposes of FMLA, serious health condition entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a health care provider as defined in § 825.115," § 825.113(a). Entitled "**Inpatient care,**" 29 C.F.R. § 825.114 states the following: "Inpatient care means an overnight stay in a hospital, hospice, or residential medical care facility, including any period of incapacity as defined in § 825.113(b), or any subsequent treatment in connection with such inpatient care." 29 C.F.R. § 825.115 similarly defines the terms "continuing treatment," and § 825.113 provides definitions for "incapacity" and "treatment." Furthermore, there is a separate "Definitions" provision, which states that "[s]erious health condition means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a health care provider as defined in § 825.115" (and also incorporates the definition of "continuing treatment" set forth in § 825.115). 29 C.F.R. § 825.102.

In fact, the DOL's FMLA regulations have a rather lengthy and complicated history.

The department initially promulgated interim regulations in 1993. See 58 Fed. Reg. at 31,794. Initially, § 825.114 was entitled "What is a 'serious health condition'?"

13

Id. at 31,817. In addition to explaining, inter alia, the meaning of "continuing treatment," this regulation stated that:

> (a)    For purposes of FMLA, "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves:
>
> (1)    Any period of incapacity or treatment in connection with or consequent to inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility;
>
> . . . .

Id. In turn, the interim version of the "Definitions" regulation (29 C.F.R. § 825.800) incorporated this identical language (and also defined the terms "continuing treatment"). Id. at 31,835.

The department promulgated final regulations implementing the FMLA in 1995, which were in effect from April 6, 1995 to January 15, 2009. See 60 Fed. Reg. at 2,180. This version of § 825.114 carried the title "**What is a "serious health condition" entitling an employee to FMLA leave?"** and addressed, among other things, the meaning of "continuing treatment." 29 C.F.R. § 825.114 (effective to Jan. 15, 2009). However, just like its interim predecessor, this version included an "inpatient care" subsection:

> (a)    For purposes of FMLA, "serious health condition" entitling an employee to FMLA

14

leave means an illness, injury, impairment, or physical or mental condition that involves:

(1) Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity (for purposes of this section, defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom), or any subsequent treatment in connection with such inpatient care; or

. . . .

Section 825.800 then incorporated this same language into the DOL's definition of a "serious health condition" (and, like the interim version, also set forth a definition of "continuing treatment"). 29 C.F.R. § 825.800 (effective to Jan. 15, 2009).

In 2008, the DOL revised its regulatory scheme. The Family and Medical Leave Act of 1993, 73 Fed. Reg. 67,934 (Nov. 17, 2008) (final rule). These FMLA regulations were in effect from January 16, 2009 to March 7, 2013 (and accordingly were in effect on November 14, 2011, when Bonkowski arrived at Butler Memorial Hospital, and on November 15, 2011, when he was both admitted and discharged). It appears that, in 2013, the department "mov[ed] the definitions section from current § 825.800 to currently reserved § 825.102." The Family & Medical Leave Act, 78 Fed. Reg. 8834, 8835 (Feb. 6, 2013) (final rule). Otherwise,

15

the 2009-2013 and the current versions of §§ 825.113, 825.114, and 825.115 are essentially identical (at least for purposes of this current appeal). It was actually the 2008 rulemaking that first broke down what had, to that point, been a single "Serious health condition" regulation into three separate sections. Accordingly, the 2009-2013 version of § 825.113 was entitled "**Serious health condition**" and addressed the concepts of "incapacity" and "treatment." 29 C.F.R. § 825.113 (effective Jan. 16, 2009 to Mar. 7, 2013). Subsection (a) of this regulation stated that, "[f]or purposes of FMLA, 'serious health condition' entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a health care provider as defined in § 825.115." While § 825.115 explained what was meant by the terms "continuing treatment," § 825.114 ("**Inpatient care**") stated the following: "Inpatient care means an overnight stay in a hospital, hospice, or residential medical care facility, including any period of incapacity as defined in § 825.113(b), or any subsequent treatment in connection with such inpatient care." 29 C.F.R. §§ 825.114, 825.115 (effective Jan. 16, 2009 to Mar. 7, 2013). Likewise, § 825.800 provided a definition of "Continuing treatment" and explained that "Serious health condition means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a health care provider as defined in § 825.115." 29 C.F.R. § 825.800 (effective Jan. 16, 2009 to Mar. 7, 2013).

As part of the rulemaking process, the DOL has received numerous comments from interested parties, such as

16

employers, labor unions, and advocacy organizations, regarding the meaning and scope of the "continuing treatment" language in the FMLA, and, in turn, the department, has examined this "continuing treatment" concept in some detail. See 73 Fed. Reg. at 67,944-50; 60 Fed. Reg. at 2191-96; 58 Fed. Reg. at 31,799. In contrast, neither the DOL nor the commenters have devoted the same level of scrutiny to either the statutory concept of "inpatient care" or the department's own "overnight stay" language. As part of its 1993 interim rulemaking, the department expressly distinguished between the "inpatient care" and "continuing treatment" prongs (or "definitions") of a "serious health condition": "FMLA defines a 'serious health condition' as one which requires either inpatient care, or 'continuing treatment by a health care provider.' Although the meaning of inpatient care is evident, the alternative definition raises difficult questions." 58 Fed. Reg. at 31,799. When it promulgated its final regulations in 1995, the DOL explained that, "[w]hile the meaning of inpatient care is evident (i.e., an overnight stay in the hospital, etc.), the concept of continuing treatment presents more difficult issues." 60 Fed. Reg. at 2192. Most recently, the preamble to the regulations promulgated in 2008 included the following discussion of "Section 825.114 (Inpatient Care)":

> Section 825.114 of the proposed rule defined what constitutes inpatient care, adopting language from the current regulations. The definition of "inpatient care" in current § 825.114(a)(1) incorporates a definition of "incapacity," which was removed from proposed § 825.114 and replaced by a cross-

17

reference to the stand-alone definition of "incapacity" in proposed § 825.113(b).

The Equal Employment Advisory Council commented, "[w]e hope that setting 'incapacity' apart will emphasize for both employees and health care providers that actual inability to work is a fundamental prerequisite for FMLA protection." There were no substantive comments on this section of the proposal, and the Department made no changes to the proposed text of this section in the final rule.

73 Fed. Reg. at 67,947; see also Family & Medical Leave Act Regulations: A Report on the Department of Labor's Request for Information, 72 Fed. Reg. 35,550, 35,564 (June 28, 2007) ("The first regulatory definition in the regulations [promulgated in 1995] is a stand-alone definition from the statute—'inpatient care (i.e., an overnight stay) in a hospital.'").

While the DOL has indicated in its rulemaking that the statutory terms "inpatient care" clearly (or "evidently") mean "an overnight stay," the department has not expressly addressed what exactly it means by "an overnight stay." The parties, in turn, do not cite to any DOL materials or publications that address the meaning of § 825.114 (or its predecessors). It is our responsibility to interpret this regulation defining the statutory terms "inpatient care" as "an overnight stay." The District Court and the parties have

18

proffered three basic approaches to § 825.114 and its "overnight stay" language—(1) the District Court's "sunset-sunrise" approach; (2) the "totality of the circumstances" approach offered by Bonkowski; and (3) Oberg's "calendar day" approach. Specifically, the District Court relied on dictionary definitions of "overnight, "duration," and "night" to conclude that "an 'overnight' stay at a hospital is a stay from sunset on one day to sunrise the next day." Bonkowski, 992 F. Supp. 2d at 511. Bonkowski argues that "[t]he totality of the circumstances demonstrate a genuine issue of material fact regarding whether Mr. Bonkowski stayed overnight at a hospital." (Appellant's Brief at 44 (emphasis omitted).) In addition to defending the District Court's "sunset-sunrise" definition, Oberg contends that, at a minimum, the terms "an overnight stay" refer to a stay from one calendar day to the next calendar day as measured by the inpatient's admission and discharge times.

This Court ultimately agrees with the interpretation proffered by Oberg—although with one major modification. We believe that "an overnight stay" means a stay in a hospital, hospice, or residential medical care facility for a substantial period of time from one calendar day to the next calendar day as measured by the individual's time of admission and his or her time of discharge.

In interpreting a federal regulation, we look to well-established principles of statutory interpretation. See, e.g., Schaar v. Lehigh Valley Health Servs., Inc., 598 F.3d 156, 1 60 (3d Cir. 2010). While a court generally should consider dictionary definitions as part of the interpretation process, it

19

must do so with some care:

> "[T]he starting point for interpreting a statute is the language of the statute itself." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., [477 U.S. 102, 108] (1980).  When words are not defined within the statute, we construe them "in accordance with [their] ordinary or natural meaning." FDIC v. Meyer, [510 U.S. 471, 476] (1994).  We do not, however, do so blindly.
>
> > "[F]requently words of general meaning are used in a statute . . . and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."
>
> Holy Trinity Church v. United States, [143 U.S. 457, 459] (1892).  In such cases, resorting to dictionary definitions may be helpful. See MCI Telecomm. Corp. v. Am. Tel. & Tel. Co., [512 U.S. 218, 225] (1994) (stating, based on "[v]irtually every dictionary," that "'to modify' means to change moderately or in minor fashion").  Ultimately though, "[a]mbiguity is a creature not of definitional possibilities but of statutory context," Brown v. Gardner, [513 U.S.

20

115, 118] (1994), so the touchstone of statutory
analysis should, again, be the statute itself.

United States v. Brown, 740 F.3d 145, 149 (3d Cir. 2014).
"We look to dictionary definitions to determine the ordinary
meaning of a word." United States v. Husmann, 765 F.3d 169,
173 (3d Cir. 2014) (citing United States v. Geiser, 527 F.3d
288, 294 (3d Cir. 2008)). However, it is well established that
statutory language must be read with reference to its statutory
context. See, e.g. id. "After all, '[a] word in a statute may or
may not extend to the outer limits of its definitional
possibilities. Interpretation of a word or phrase depends upon
reading the whole statutory text, considering the purpose and
context of the statute, and consulting any precedents or
authorities that inform the analysis.'" Id. (quoting Dolan v.
U.S. Postal Serv., 546 U.S. 481, 486 (2006)).

Accordingly, "[w]e assume that 'Congress expresses its
intent through the ordinary meaning of its language' and
therefore begin 'with an examination of the plain language of
the statute.'" Disabled in Action of Pa. v. Southeastern Pa.
Transp. Auth., 539 F.3d 199, 210 (3d Cir. 2008) (quoting
Rosenberg v. XM Ventures, 274 F.3d 137, 141 (3d Cir.
2001)). When the statute's language is plain, the court's
obligation is to enforce the statute according to its terms, at
least where the disposition is not absurd (or where a literal
application of a statute would not produce a result
demonstrably at odds with the intentions of its drafters). See,
e.g., Thorpe v. Borough of Thorpe, 770 F.3d 255, 263-64 (3d
Cir. 2014); Official Comm. of Unsecured Creditors of
Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330

F.3d 548, 559 (3d Cir. 2003) (en banc). In the end, we should "avoid constructions that produce 'odd' or 'absurd results' or that are 'inconsistent' with common sense.'" Disabled in Action, 539 F.3d at 210 (quoting Public Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 454 (1989); 2A N. Singer, Sutherland Statutes & Statutory Construction § 45:12 (6th ed. 2000)).

The District Court relied on the on-line versions of The Merriam-Webster Dictionary and The Oxford Dictionaries. We find it significant that the District Court did not mention alternative definitions of the words "overnight" and "night" that are set forth in these two dictionaries. As the District Court pointed out, The Merriam-Webster Dictionary does define the word "overnight"—used as an adverb—to mean "for or during the entire night." The Merriam-Webster Dictionary, Overnight, http://www.merriam-webster.com/dictionary/overnight (last visited Dec. 11, 2014). However, it also defines the term as meaning "on the evening before" or "very quickly or suddenly." Id. When used as an adjective (i.e., "an overnight stay"), "overnight" is defined to mean, among other things, "of, lasting, or staying the night," "SUDDEN, RAPID," "traveling during the night," "accomplished by a mail service within one day's time," or "delivered within one day's time." Id. Likewise, The Oxford Dictionaries defines this term (used as an adverb) as "[f]or the duration of a night," but the District Court did not mention that this on-line dictionary goes on to state that "overnight" could mean "[d]uring the course of a night" or "[v]ery quickly; suddenly." The Oxford Dictionaries, Overnight, http://www.oxforddictionaries.com/us/definition.american_en glish/overnight (last visited Dec. 22, 2014). Like The

22

Merriam-Webster Dictionary, The Oxford Dictionaries defines the adjectival form of "overnight" as "[f]or use overnight," "[d]one or happening overnight," or "[s]udden, rapid, or instant." Id. Furthermore, we acknowledge that The Merriam-Webster Dictionary defines "night" as "the time from dusk to dawn when no sunlight is visible," The Merriam-Webster Dictionary, Night, http://www.merriam-webster.com/dictionary/night (last visited Dec. 11, 2014), and The Oxford Dictionaries defines this term as "[t]he period of darkness in each twenty-four hours; the time from sunset to sunrise," The Oxford Dictionaries, Night, http://www.oxforddictionaries.com/us/definition/american-english/night (last visited Dec. 16, 2014). The District Court, however, failed to acknowledge that this word is also defined, inter alia, as "the final part of the day that is usually after work, school, etc., and before you go to bed: the early part of the night," The Merriam-Webster Dictionary, Night, supra, and as "[t]he period of time between afternoon and bedtime; an evening," The Oxford Dictionaries, Night, supra. Given these various definitions, it is not clear to us that (as the District Court put it) "[t]he ordinary meaning of the word "overnight" in this context is 'for the duration of the entire night'" or that "an 'overnight' stay at a hospital is a stay from sunset on one day to sunrise the next day," Bonkowski, 992 F. Supp. 2d at 511.

In any event, the District Court proceeded to adopt an overly narrow reading of § 825.114's "overnight stay" language. In short, its entire approach is premised on such extraneous factors as the time of year and the geographic location. Simply put, sunset and sunrise times vary throughout

23

the course of the year (after all, everyone knows that "nights" are longer in the winter than in the summer) and are determined by the viewer's position on the Earth (i.e., his or her latitude, longitude, and elevation). Bonkowski provides a number of examples in which "the District Court's narrow construction of 'overnight'" appears to result in "unfair discrimination between different individuals who have similar needs." (Appellant's Brief at 32 (emphasis omitted).) The District Court relied on The Old Farmer's Almanac to find that, in the zip code for Butler Memorial Hospital, the sun set at 5:02 p.m. on November 14, 2011 and rose at 7:07 a.m. on November 15, 2011. See The Old Farmer's Almanac, http://www.almanac.com/astromony/rise/zipcode/16001/2011-11-14, http://www.almanac.com/astronomy/rise/zipcode/2011-11-15 (last visited on Jan. 5, 2015). On May 14, 2011 and May 15, 2011, sunset occurred at 8:29 p.m., and sunrise took place at 6:01 a.m. See The Old Farmer's Almanac, http://www.almanac.com/astronomy/rise/zipcode/16001/2011-05-14, http://www.almanac.com/astronomy/rise/zipcode/16001/2011-5-15 (last visited Jan. 5, 2015). Accordingly, an individual who arrived at the hospital at 8:00 p.m. on May 14 and was discharged at 7:30 a.m. the following calendar day would satisfy the District Court's "overnight stay" definition—while someone who arrived at 8:00 p.m. on November 14 and left at 7:30 a.m. on November 15 would not. A patient would also need to remain at the hospital for more than fourteen hours on November 14 and November 15 to meet the District Court's definition. However, a patient who stayed at the hospital on May 14 and May 15 need only remain there for approximately ten hours. We likewise note that, in Portland, Maine, the sun

24

set at 4:16 p.m. on November 14, 2011 and rose at 6:35 a.m. on November 15, 2011. See The Old Farmer's Almanac, http://www.almanac.com/astronomy/rise/ME/Portland/2011-11-14, http://www.almanac.com/astronomy/rise/ME/Portland/2011-11-15 (last visited Jan. 5, 2015). A person who walked into a hospital at 5:00 p.m. on November 14 and was then released at 7:30 a.m. on November 15 would meet the District Court's "sunset-sunrise" approach if he or she went to a hospital in Butler, Pennsylvania—but not in Portland, Maine. In turn, an individual would be required to stay at a Portland hospital for (approximately) one more hour than his or her counterpart in Miami, Florida (where the sun set at 5:32 p.m. and rose at 6:39 a.m.). See The Old Farmer's Almanac, http://www.almanac.com/astronomy/rise/FL/Miami/2011-11-14, http://www.almanac.com/astronomy/rise/FL/Miami/2011-11-15 (last visited Jan. 5, 2015).

In fact, there are certain geographic locations where a "sunset-sunrise" approach does not make any sense at all. In Fairbanks, Alaska, the sun set at 2:40 p.m. on December 21, 2011 and then rose at 10:58 a.m. on December 22, 2011—more than twenty hours later. See The Old Farmer's Almanac, http://www.almanac.com/astronomy/rise/AK/Fairbanks/2011-12-21, http://www.almanac.com/astronomy/rise/AK/Fairbanks/2011-12-22 (last visited January 5, 2015). Accordingly, a Fairbanks patient who arrived at the hospital at 3:00 p.m. on December 21, 2011 and was discharged at noon the next calendar day would not satisfy the District Court's definition of an "overnight stay." In contrast, the sun set in Fairbanks on June

25

21, 2011 at 12:48 a.m. and then rose on the same calendar day less than three hours later at 2:57 a.m. See The Old Farmer's Almanac, http://www.almanac.com/astronomy/rise/AK/Fairbanks/2011-6-21, http://almanac.com/astronomy/rise/AK/Fairbanks/2011-6-22 (last visited Jan. 5, 2015). A stay in a Fairbanks hospital from 12:15 a.m. to 3:30 a.m. would thereby constitute "an overnight stay" under the District Court's approach.

Given these consequences, we must conclude that the District Court's "sunset-sunrise" interpretation produces "'odd' or 'absurd results.'" Disabled in Action, 539 F.3d at 210 (citation omitted). Although Oberg argues that this approach has a rational basis, we do not believe that it constitutes an appropriate reading of § 825.114 in the present statutory and regulatory context.[2] See, e.g., Husmann, 765 F.3d at 173 ("'We look to dictionary definitions to determine the ordinary meaning of a word.' See United States v. Geiser,

---

[2] Oberg indicates that this Court should accept the "sunset-sunrise" definition because it constitutes a reasonable interpretation of § 825.114. For support, it cites to Judge Rosenn's dissenting opinion in Federal Labor Relations Authority v. U.S. Department of the Navy, 966 F.2d 747 (3d Cir. 1992) (en banc). Judge Rosenn, however, recognized that the courts generally defer to an agency's reasonable interpretation of doubtful regulatory language. Id. at 774 (Rosenn, J., dissenting). As we have already noted, the DOL has not addressed the meaning of its own "overnight stay" language in its FMLA rulemaking, and the parties likewise do not cite to any other DOL materials discussing this concept.

527 F.3d 288, 294 (3d Cir. 2008). It is well settled, however, that a 'word must not be read in isolation but instead defined by reference to its statutory context.' Ali v. Fed. Bureau of Prisons, [552 U.S. 214, 234] (2008)."). This case involves a DOL regulation implementing a remedial statute designed, at least in part, to address problems associated with "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods," § 2601(a)(4), and to provide employees with the legal right to "take reasonable leave for medical reasons," § 2601(b)(2). The District Court turned to FAA regulations, which define "night" as "the time between the end of evening civil twilight and the beginning of morning civil twilight, as published in the Air Almanac." 15 C.F.R. § 1.1. It would appear that the lack of sunlight could raise serious safety issues in the context of air travel. However, the absence of sunlight, the time of year, the geographic location, and similar considerations do not have any real relevance to a regulation and statute designed to protect the rights of employees to "take reasonable leave for medical reasons."

Although we thereby reject the District Court's reading of § 825.114, we also determine that the interpretation proffered by Bonkowski is fundamentally flawed. Insisting that the question of whether an employee has "a serious health condition" under the FMLA constitutes a question of fact to be decided by the jury, he argues that, given the totality of the circumstances, a reasonable juror could find that he stayed overnight at a hospital. His theory, however, is based on a misunderstanding of the judiciary's obligation to interpret the law and the jury's responsibility to make findings of fact. In

27

the end, we must reject an open-ended "totality of the circumstances" interpretation of the regulation and its "an overnight stay" language.

While juries make factual findings, it is the responsibility of the judiciary to decide legal questions. This obligation clearly encompasses disputes regarding the meaning of federal statutes and federal regulations. We have approached questions of statutory and regulatory interpretation under the FMLA as questions of law to be decided by the courts themselves. See, e.g., Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 255 (3d Cir. 2014) ("'Accordingly, we interpret[ed] the requirement that an employee 'take' FMLA leave to connote invocation of FMLA rights, not actual commencement of leave.' [Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009).] The same reasoning applies here. A reading of the statute that denies all rights that the FMLA guarantees until the time that an employer designates the employee's leave as FMLA would be illogical and unfair."); Haybarger v. Lawrence Cnty. Adult Prob. & Parole, 667 F.3d 408, 410, 412-17 (3d Cir. 2012) (concluding that supervisor at public agency may be subject to individual liability under FMLA). Accordingly, it is our obligation to interpret the DOL regulation at issue in this case. In other words, we must decide what the terms "an overnight stay" actually mean. It is then the jury's responsibility to dispose of any genuine issues of material fact on the basis of judicial instructions explaining the meaning of this legal concept of an "overnight stay".

In fact, the two Third Circuit cases cited by Bonkowski

indicate that it is the judiciary that must interpret and give meaning to the FMLA (and the DOL's FMLA regulations).

In Schaar v. Lehigh Valley Health Services, Inc., 598 F.3d 156 (3d Cir. 2010), we considered "whether a combination of expert and lay testimony can establish that an employee was incapacitated for more than three days as required by the FMLA's implementing regulations," id. at 156. Answering this question in the affirmative, we explained that "[o]ur interpretation is guided by the statute and the Department of Labor regulations" and that "[w]e interpret those regulations using our well-established canons of statutory interpretation." Id. at 160. It was only after we interpreted the statutory and regulatory language to conclude that an employee may satisfy his or her burden of proving incapacitation through a combination of expert and lay testimony that we decided whether there was a genuine issue of material fact. Id. at 160-61. Applying this interpretation of the FMLA scheme, the Schaar Court determined that, given the doctor's assertion that the plaintiff was incapacitated for two days and the plaintiff's own testimony that she was incapacitated for two additional days, "a material issue of fact exists as to whether Schaar suffered from a 'serious health condition.'" Id. at 161.

In Victorelli v. Shadyside Hospital, 128 F.3d 184 (3d Cir. 1997), we similarly "disagree[d] with the district court's conclusion that as a matter of law the condition [i.e., a peptic ulcer] was a 'minor one,'" id. at 187. Specifically, we concluded that the district court adopted an unduly narrow construction of the "continuing treatment" standard set forth in

the DOL's interim regulations. Id. "Moreover, even if we consider the provisions of the final regulation [i.e., the regulations promulgated in 1995], we find that it neither states nor implies that Victorelli's ulcer could not meet the requirements of a 'serious health condition.'" Id. at 187-88. This Court accordingly conducted its own analysis of the regulatory provisions in order to ascertain the meaning of the terms "continuing treatment." Id. at 186-90. We then determined that "there is a material issue of fact whether Victorelli suffered a 'serious health condition' as interpreted under both the interim and the final rule." Id. at 190. Significantly, the Court in Victorelli recognized that "[a] district court's interpretation of a federal regulation is a question of law subject to plenary review." Id. at 186 (citing Helen L. v. DiDario, 46 F.3d 325, 329 (3d Cir. 1995); ADAPT v. Skinner, 881 F.2d 1184, 1191 n.6 (3d Cir. 1989)).

It is conceivable that a court could interpret a particular statutory or regulatory provision as establishing some sort of multi-factor standard under which the fact finder determines whether a particular set of circumstances meets this standard. See, e.g., Haybarger, 667 F.3d at 418 ("As we recognized in applying the economic reality test in the context of the [Fair Labor Standards Act], whether a person functions as an employer depends on the totality of the circumstances rather than on 'technical concepts of the employment relationship.'" (citation omitted)). Even though we ultimately disagree with its interpretation, the District Court did at least adopt an objective approach that is relatively easy to apply and makes it relatively easy to predict whether an employee satisfies § 825.114 and its "overnight stay" language (i.e., one simply

30

compares his or her arrival and departure times at the hospital with the respective sunset and sunrise times set out in The Old Farmer's Almanac). In contrast, Bonkowski contends that (given the requirement to construe the terms "serious health condition" broadly to give effect to the FMLA's remedial purpose as well as the general obligation to view the evidence in the record in the light most favorable to the non-moving party in summary judgment proceedings) a reasonable juror could find that he stayed overnight at the hospital because the record demonstrated that:

> Mr. Bonkowski arrived at the hospital shortly before midnight on November 14, 2011; that Mr. Bonkowski was admitted to the hospital shortly after midnight; that the hospital repeatedly designated Mr. Bonkowski as "inpatient;" that he remained at the hospital as an "inpatient" until the evening of November 15, 2011 [and thereby spent more than fourteen hours at the hospital]; that, while hospitalized, Mr. Bonkowski underwent comprehensive testing; that Mr. Bonkowski's doctor wrote him a medical note excusing him from work on November 15, 2011 because Mr. Bonkowski was "hospitalized;" that the District Court itself referenced Mr. Bonkowski's stay at the hospital as "inpatient;" and that Defendant referred to Mr. Bonkowski's time at the hospital as an "overnight situation."

(Appellants' Brief at 19-20.) We believe that any kind of

31

"totality of the circumstances" approach would make it more difficult for both employers and employees to predict whether a specific set of circumstances rises to the level of "an overnight stay" under § 825.114 and lead to additional litigation in the future with possibly inconsistent results. The adoption of such an open-ended approach could even encourage an employer to take adverse action against an employee because the employer may be willing to take the chance that the jury would ultimately determine that the employee's time at a hospital did not constitute "an overnight stay" under the "totality of the circumstances." In any event, it is certainly possible—and even likely—that one jury could determine that a particular set of facts rose to the level of "an overnight stay" under § 825.114 while another jury could find that this same exact factual circumstances did not constitute "an overnight stay." Bonkowski suggests that a juror could rule in his favor because he or she may have had the experience of checking into a hotel in the middle of the night (e.g., 1:30 a.m.), falling asleep, checking out early in the morning, and being charged an overnight stay.[3] However, the interpretation of a DOL regulation implementing a federal medical leave statute should not rest on speculation as to the personal experience of a potential juror concerning the billing

---

[3] However, we find it likely the hotel would also charge this juror for an overnight stay (or an equivalent fee) if he or she checked in and then checked out in the middle of the afternoon (e.g., checked in at 3 p.m. and then checked out of the hotel at 4 p.m.) or the juror stayed past the checkout time.

32

practices in the hotel business.[4]

_____

[4] Bonkowski refers in passing to an on-line dictionary definition of "inpatient" as: "'a patient who comes to a hospital or other health care facility for treatment that requires an **overnight stay**.' Or, 'a hospital patient who occupies a bed for at least one night in the course of treatment, examination, or observation.'" (Appellant's Brief at 45 n.6 (quoting Medical Dictionary, Inpatient, http://medical-dictionary.thefreedictionary.com/inpatient (last visited May 8, 2014)).) This definition, however, does not really help us to interpret § 825.114 and its "overnight stay" language. After all, the regulation itself already defines "inpatient care" as "an overnight stay," and, in turn, the on-line definition of "inpatient" does not actually explain the meaning of "an overnight stay" (or "occupy[ing] a bed for at least one night").

Bonkowski similarly points out that he was designated as "inpatient" in the Butler Memorial Hospital's records, Proviano (the head of Oberg's human resources department) characterized his time at the hospital as an "overnight situation" (A292), and the District Court referred to his stay at the hospital as inpatient care.  Even if we were to adopt a "totality of the circumstances" approach, we do not believe that such passing references by a district judge, a manager, or hospital personnel would be considered dispositive or even especially relevant to the outcome.  After all, Bonkowski has provided no evidence regarding the standards, if any, that Butler Memorial Hospital may have used in deciding to use the title "Discharged Inpatient Report" on his records, and there is no indication that it determined the time he spent at the hospital rose to the level of "an overnight stay" under § 825.114 (and, in fact, the hospital records cited by Bonkowski never even referenced this concept of "an overnight stay").  As a layperson, Proviano's characterization carries little, if any, weight in ascertaining the meaning of § 825.114 and whether this "overnight stay" language has been satisfied.  Given its ultimate determination that "[t]he undisputed evidence of record shows that plaintiff did not stay overnight as an inpatient in the hospital" under its own "sunset-sunrise" approach, Bonkowski, 992 F. Supp. 2d at 512, we also refuse to read too much into the District Court's passing references to his admission as an inpatient and the time he spent at the hospital as an inpatient.

Having considered and rejected both the "sunset-sunrise" definition as well as an open-ended "totality of the circumstances" approach, we conclude that "an overnight stay" under § 825.114 means a stay in a hospital, hospice, or residential medical care facility for a substantial period of time from one calendar day to the next calendar day as measured by the individual's time of admission and time of discharge.

While he was not admitted until shortly after midnight on November 15, 2011, Bonkowski testified at his deposition that, when he was being wheeled into Butler Memorial Hospital, he saw a clock showing that "it was a few minutes before 12:00." (A279.) He therefore takes issue with Oberg's position that a patient's stay in a hospital, hospice, or residential medical care facility should be measured from the

According to Bonkowski, the First Circuit held that "'the [FMLA] should be interpreted broadly enough to protect absences from work that are necessary for the purpose of having one's condition diagnosed and treated. . .'" (Appellant's Brief at 45 (quoting Hodgens, 144 F.3d at 165).) The Hodgens court made this statement as part of its rejection of the district court's determination that "'there is no evidence that [his health] condition rendered him unable to perform the functions of his position,' as required in 29 U.S.C. § 2612(a)(1)(D)." Hodgens, 144 F.3d at 163. In fact, the First Circuit stated elsewhere in its opinion that "Hodgens does not argue that he received any inpatient care for his condition; thus § 2611(11)(A) does not apply." Id. at 161; see also id. at 162 n.7 ("Subsection 114(a)(1), dealing with inpatient care, is not applicable here.").

35

moment the individual was admitted. According to Bonkowski, it would be absurd (and contrary to the remedial purpose of the FMLA) to exclude from the definition of "an overnight stay" an individual who arrived at the hospital at 9:00 p.m. on November 14, 2011, was admitted at 12:01 a.m. on November 15, 2011, and was finally discharged at 11:59 p.m. on November 15, 2011. However, as Oberg points out, the Second Circuit has specifically addressed the admission concept under a similar statutory and regulatory scheme.

In Estate of Landers v. Leavitt, 545 F.3d 98 (2d Cir. 2009), the plaintiffs were Medicare beneficiaries who received inpatient hospital care followed by care at skilled nursing facilities ("SNFs"), id. at 103. Part A of the Medicare statute provides coverage for post-hospital extended care services if such services are furnished to an individual "'after transfer from a hospital in which he was an inpatient for not less than 3 consecutive days before his discharge from the hospital in connection with such transfer.'" Id. (quoting 42 U.S.C. § 1395x(h)). The Centers for Medicare and Medicaid Services ("CMS") denied the plaintiffs' claims for Part A coverage pursuant to two of its own rules, i.e., the so-called "'three-midnight rule'" in which "a patient is eligible for SNF coverage only if he or she has been 'hospitalized . . . for medically necessary inpatient hospital or inpatient [critical access hospital] care, for at least 3 consecutive calendar days, not counting the date of discharge,'" id. at 104 (quoting 42 C.F.R. 409.30(a)(1)), and another rule providing that "'a patient is considered an inpatient if [he or she] is formally admitted as [an] inpatient,'" id. (quoting CMS, Publ'n No. 100-02, Medicare Benefit Policy Manual, ch. 1, § 10 (45th rev.

36

2006)). The plaintiffs (on behalf of a class certified by the district court) challenged CMS's exclusion of time they spent in the emergency room or on observation status from counting toward the qualifying stay requirement. Id. Upholding the district court's grant of summary judgment in favor of the Secretary of Health and Human Services, the Second Circuit explained that neither the Medicare statute nor the applicable regulation defines the term "inpatient" and that the statute itself is ambiguous regarding whether pre-admission time spent in observation and in the emergency room should be considered inpatient time upon the individual's later admission. Id. at 105-06. Based in part on an analysis of CMS's long-standing, consistent, and reasoned interpretation of the statutory language, it proceeded to accord Skidmore[5] deference to the agency's definition of an "inpatient" as a person who has been formally admitted to a hospital. Id. at 105-10. The Landers court concluded that "a Medicare beneficiary is not an inpatient within the meaning of § 1395x(i) unless he or she has been formally admitted to the hospital" because this conclusion "is informed by CMS's highly persuasive interpretation" and "it accords with the

---

[5] The Second Circuit declined to apply the Chevron doctrine because the CMS interpretation of "inpatient" was contained in a policy manual. Landers, 545 F.3d at 105-06. Under the Skidmore doctrine, an agency interpretation is entitled to "'respect according to its persuasiveness,' as evidenced by" its thoroughness, the validity of the agency's reasoning, consistency, and other factors that give the interpretation power to persuade. Id. at 107 (citation omitted).

37

statutory text and our governing precedents." Id. at 111.

In the end:

[W]e conclude this portion of our opinion by reiterating our core holding in this case: in determining whether a Medicare beneficiary has met the statutory three-day hospital stay requirement needed to qualify for post-hospitalization SNF benefits under Part A, the time that the patient spends in the emergency room or on observation status before being formally admitted to the hospital does not count. In so holding, we expressly reject the rule of Jenkel v. Shalala, 845 F. Supp. 69 (D. Conn. 1994), which held that "later 'formal admission'" of a patient following her treatment in the emergency room operates as "a nunc pro tunc ratification of her de facto admission at the time of her arrival in the emergency room." Id. at 71 (emphasis omitted). . .

Id. at 112. The Second Circuit also rejected the plaintiffs' equal protection challenge. Id. "CMS rationally could have concluded that a bright line rule measuring inpatient time based on formal admission would simplify claims processing and reduce administration costs, while targeting the program at the group Congress intended to benefit." Id.

Admittedly, this appeal implicates a different statutory scheme enforced by a different federal agency. The Second

38

Circuit itself premised its holding on an express agency policy interpreting the meaning of the term "inpatient" under the Medicare program (and the Landers court explained that, "[if] CMS were to promulgate a different definition of inpatient in the exercise of its authority to make rules carrying the force of law, that definition would be eligible for Chevron deference notwithstanding our holding today," id. (citation omitted)). It is uncontested that there are no DOL regulations or policies expressly defining the word "inpatient" in terms of formal admission or explaining why time spent in the emergency room or under observation status does not count towards determining whether the individual meets § 825.114 and its "overnight stay" language.

Nevertheless, we believe it is appropriate to follow the Second Circuit's example. We accordingly conclude that "an overnight stay" under § 825.114 is triggered by the individual's admission—and not his or her arrival at the hospital. After all, both the Medicare and FMLA schemes incorporate the same basic notion of inpatient care. While Bonkowski contends that (unlike in the Medicare Act context) there is a requirement to construe the language of the FMLA in order to give effect to the statute's remedial purpose, amici in Landers actually challenged CMS's definition of "inpatient" on the similar grounds that "the general purpose of the Medicare Act is 'to provide affordable medical insurance for the aged and disabled,' [Furlong v. Shalala, 156 F.3d 384, 392 (2d Cir. 1998)], and that the Social Security Act is to be 'liberally construed and applied,' Rosenberg v. Richardson, 538 F.2d 487, 490 (2d Cir. 1976); see Mayburg v. Sec'y of Health & Human Svcs., 740 F.2d 100, 103 (1st Cir. 1984)."

39

Landers v. Leavitt, Civil Action No. 3:04-cv-1988 (JCH), 2006 WL 2560297, at *11 (D. Conn. Sept. 1, 2006); see also, e.g., Landers, 545 F.3d at 103 (noting that Part A provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care for eligible persons over the age of 65). CMS also declined to change its long-standing interpretation because, among other things, it did not believe that time spent in an emergency room prior to formal admission would, by itself, identify the severity of the individual's condition. Landers, 545 F.3d at 109. It appears that an individual likewise does not have a condition that involves "inpatient care in a hospital, hospice, or residential medical care facility" merely because he or she spends some time in a hospital emergency room. After all, the fact that an individual is sitting in a hospital emergency or waiting room does not necessarily indicate that his or her condition constitutes more than a short-term medical problem that would generally be covered by the employer's sick leave policy. See, e.g., 60 Fed. Reg. at 2191-92; 58 Fed. Reg. at 31,799. The time of admission also provides a relatively straight-forward and objective criterion to apply (and to predict). In this case, the Butler Memorial Hospital records provided by Bonkowski expressly identified the "Reg" date or "ADM-DT" (but not the time that he first arrived at the hospital). In the end, the time of admission—whether considered under the auspices of the FMLA or the Medicare Act—represents a bright-line rule that targets the persons that Congress (and the respective federal agency) intended to protect. [6] See, e.g., Landers, 545 F.3d at

---

[6] In Lichtenstein v. University of Pittsburgh Medical Center, 691 F.3d 294 (3d Cir. 2012), this Court determined

40

that a jury could find that the employee provided adequate notice about her need to take leave under the FMLA (i.e., sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request) where, inter alia, she told her supervisor that her mother was taken to the hospital in an ambulance and was currently in the emergency room, id. at 303-07.  We explained that "[i]t does not matter that a person rushed by ambulance to the emergency room 'might not' require inpatient care as defined under the FMLA." Id. at 305.  Noting that data indicated that approximately 40% of people taken to the emergency room in an ambulance are "admitted for inpatient care" compared with just 10% of "walk-ins," id. at 305 n.16, we observed that, "[s]ince many people in this situation *do* require such care, a jury might find that reasonable notice was given under the circumstances," id. at 305.  Although it did not directly address the question of whether admission is necessary to trigger § 825.114 and its "overnight stay" language, the Lichtenstein Court did distinguish between the emergency room, on the one hand, and "inpatient care as defined under the FMLA" (and individuals "admitted for inpatient care"), on the other hand (and also drew a distinction between individuals taken to the emergency room in an ambulance, like Lichtenstein's mother, and those who do not arrive in an ambulance, like Bonkowski himself).

41

We further note that a number of district courts have indicated that a mere visit to a hospital emergency room is not enough to satisfy § 825.114. See, e.g., Johnson v. Dollar Gen., 880 F. Supp. 2d 967, 987 (N.D. Iowa 2012) ("Neither a trip to the emergency room nor an in-person visit with the on-call doctor—both of which Johnson's doctor's medical assistant urged when Johnson called his doctor's office on May 1, 2009—would have constituted 'inpatient care,' and Johnson refused either kind of treatment."), aff'd, 508 F. App'x 587 (8th Cir. 2013) (per curiam); Anderson v. Nissan N. Am., Inc., Civil Action No. 3:09-cv-525 HTW-LRA, 2011 WL 4625647, at *8 (S.D. Miss. Sept. 30, 2011) ("The evidence provided by plaintiff to date does not support a conclusion that her husband's emergency room visit qualifies under this definition."); Santiago v. N.Y. City Police Dep't, No. 05 Civ. 3035(PAC)(MHD), 2007 WL 4382752, at *15 n.9 (S.D.N.Y. Dec. 14, 2007) ("Although plaintiff was seen once at Columbia Presbyterian Hospital in late July or early August 2004, his visit was not 'inpatient care' as defined under the FMLA. It is not clear whether plaintiff was even admitted on that occasion, but in any event, he testified that he was there for four or five hours and did not seek any other follow-up treatment." (citations omitted)), aff'd, 329 F. App'x 328 (2d Cir. 2009) (summary order). But see, e.g., Schuler v. Branch Banking & Trust Co., No. 1:08cv378, 2009 WL 3261683, at *7 (W.D.N.C. Jul. 27, 2009) (Howell, U.S.M.J.) ("The plaintiff has presented evidence that could be considered to show that the plaintiff did have an overnight stay in the hospital. On December 24 and 25, that being Christmas Eve and Christmas Day of 2006, the plaintiff's

112.

Like the time of admission, a "calendar day" interpretation constitutes an objective "bright-line" criterion for deciding whether the individual's time in the hospital rises to the level of "an overnight stay" under § 825.114. This should help to simplify any disputes arising out of the regulation's "overnight stay" language (and perhaps even help to deter future disputes and FMLA violations because a bright-line interpretation should put employers (and their employees) on notice of when exactly an employee is entitled to leave under the FMLA and § 825.114). In addition, this reading is consistent with the purpose of the FMLA as well as the DOL's own regulatory scheme. Without more, an individual who was admitted and discharged by a hospital on the same calendar day appears to have (as the DOL put it in its preamble to the regulations promulgated in 1995) a "short-term condition[] for which treatment and recovery are very brief [that Congress expected] would be covered by even the most modest of employer sick leave policies." 60 Fed. Reg. at 2191-92. As Oberg recognizes, its definition of "overnight stay" as "a hospital stay from one day to the next, measured by the inpatient's admission and discharge" generally constitutes a more liberal construction of the FMLA than the strict "sunrise-

_____

health problems had progressed to the point that she went to the emergency room at the hospital. The plaintiff, on one occasion, spent the entire night at the hospital [evidently in the emergency room]."), report & recommendation rejected in part on other grounds & adopted in part, 2009 WL 3261665 (W.D.N.C. Oct. 8, 2009).

sunset" definition offered by the District Court. (Appellee's Brief at 17 (footnote omitted).) For instance, an individual need not be admitted to the hospital before the sun sets (which, on November 14, 2011, occurred approximately six hours before midnight) in order for his or her stay at the hospital to rise to the level of "an overnight stay." We further note that, in any event, a plaintiff who thereby fails to satisfy 29 C.F.R. § 825.114 and the "inpatient care" prong of 29 U.S.C. § 2611(11)(A) is not left without any possible recourse under the FMLA. He or she may still be able to establish that the illness, injury, impairment, or physical condition at issue involves "continuing treatment by a health care provider" pursuant to 29 U.S.C. § 2611(11)(B) and 29 C.F.R. §§ 825.113 and 825.115.

Significantly, the DOL, like CMS,[7] has actually relied on this notion of a "calendar day" to explain the scope of the alternative "continuing treatment" prong. For instance, the current version of § 825.115 provides that a serious health condition involving continuing treatment by a health care provider includes, inter alia: (1) "[a] period of incapacity of more than three consecutive, full calendar days," § 825.115(a); and (2) any period of absence to receive multiple treatments (including any period of recovery) by a health care provider

_____

[7] As the Second Circuit pointed out in Landers, CMS adopted a so-called "three-midnight rule," requiring the patient to be hospitalized for inpatient care "'for at least 3 consecutive calendar days, not counting the date of discharge.'" Landers, 545 F.3d at 103 (quoting § 409.30(a)(1)). It appears that, under the CMS Policy Manual, the decision to admit a patient should be made using "'a 24 hour period as a benchmark, i.e., they should order admission for patients who are expected to need hospital care for 24 hours or more.'" Landers, 2006 WL 2560297, at *5 (quoting Policy Manual Ch. 1, § 10). The Medicare agency has also created a "two-midnight benchmark," in which "hospital visits that are expected to last less than two midnights are generally considered inappropriate for inpatient admission [while] hospital visits that are expected to last two midnights or longer are considered appropriate for admission," and a "two-midnight presumption" providing that claims for stays longer than two midnights will be presumed to be generally appropriate for payment under Part A. Bagnall v. Sebelius, No. 03:11cv1703 (MPS), 2013 WL 5346659, at *12 n.11 (D. Conn. Sept. 23, 2013) (quoting 42 C.F.R. § 412.3(e)(1)).

45

for "[a] condition that would likely result in a period of incapacity of more than three consecutive, full calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc), severe arthritis (physical therapy), or kidney disease (dialysis)," § 825.115(e)(2). In fact, the department adopted—and has continued to apply—a requirement of three calendar days of incapacity, even though members of the business community would prefer, among other changes, a longer minimum period or a period measured in terms of business or working days and several advocacy organizations took issue with any minimum durational limit. See 73 Fed. Reg. at 67,946-47; 60 Fed. Reg. at 2191-95. The DOL "concluded that the 'more than three days' test continues to be appropriate" on the grounds that "[t]he legislative history specifically provides that conditions lasting only a few days were not intended to be included as serious health conditions, because such conditions are normally covered by employers' sick leave plans." 60 Fed. Reg. at 2195. Under the circumstances, we determine that a similar "calendar day" approach is appropriate for purposes of § 825.114 and its "overnight stay" language.

Although we largely adopt Oberg's reading of § 825.114, we do so with one significant modification. The Court agrees with Bonkowski that it would be absurd to read the terms "an overnight stay" to include an employee who was admitted at 11:59 p.m. on one calendar day and discharged at 1:00 a.m. (or even as early as 12:01 a.m.) on the next calendar day. Accordingly, the individual must stay for a substantial period of time in the hospital, hospice, or residential medical facility (as measured by his or her time of admission and time

46

of discharge).  Under the circumstances, a minimum of eight hours would seem to be an appropriate period of time. However, because we need not decide this issue to resolve this dispute, we leave this issue of the requisite length of time for another day.  It is uncontested that Butler Memorial Hospital formally admitted and discharged Bonkowski on November 15, 2011.  Under our "calendar day" approach, the time Bonkowski spent in the hospital did not rise to the level of "an overnight stay" under § 825.114 because he did not stay in the hospital from one calendar day to the next calendar day as measured by his time of admission and time of discharge.

### III.

For the foregoing reasons, we will affirm the District Court's order granting the motion for summary judgment filed by Oberg.

47

FUENTES, *Circuit Judge*, Dissenting.

In this case, we must interpret the term "overnight stay" for purposes of defining a serious health condition under the FMLA. The District Court held that an "overnight stay" in a hospital is measured from sunset to sunrise. Based on dictionary definitions, the test leads to results predicated principally on geo-location and the turn of the earth's axis. The majority rejects this test and I concur. The majority then proposes a new test. It defines "overnight stay" as a hospital stay from one calendar day to the next for a substantial period of time. A "substantial period," the majority suggests, would be approximately eight hours. I believe this test is as inequitable and unworkable as the one it seeks to replace, and I therefore respectfully dissent.

Jeffrey Bonkowski suffered from a preexisting heart condition and diabetes. On November 14, 2011, he began experiencing shortness of breath and chest pains. In light of his appearance and medical history, Bonkowski's wife drove him to the hospital just after 11:00 p.m. that evening. Bonkowski arrived at the hospital shortly before midnight. Upon arrival, hospital personnel wheeled Bonkwoski into the hospital prior to midnight. Bonkowski was admitted as an "inpatient" shortly after midnight, where he remained until the early evening of November 15, 2011. The hospital performed comprehensive testing, and made contingent preparations for open heart surgery, prior to his discharge. Under the majority's rendering, although he spent in excess of fourteen hours in the hospital as an inpatient from admission to discharge, Bonkowski does not qualify for FMLA relief because he was not admitted and discharged from one calendar day to the next. Because he was admitted

after midnight, the time he spent in the hospital on the "day" of his arrival, no matter how long, will not count. If, however, he had been admitted to the hospital at 11:00 p.m. on November 14th and was discharged at 7:00 a.m. on November 15th—a total of eight hours—Bonkowski would qualify for relief under the FMLA.

The majority's approach is impractical, produces inequitable results, and is contrary to the remedial purpose of the FMLA. "Congress enacted the FMLA in response to concern regarding, [among other things], 'inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods.'"[1] The purpose of the FMLA is to "to entitle employees to take reasonable leave for medical reasons," but in a "manner that accommodates the legitimate interests of employers."[2] As a remedial statute, the FMLA is to be construed broadly "to extend coverage and [its] exclusions or exceptions should be construed narrowly."[3] Denying FMLA protection to an employee who enters the hospital one day and remains there

---

[1] *Miller v. AT&T Corp.*, 250 F.3d 820, 833 (4th Cir. 2001) (quoting 29 U.S.C. § 2601(a)(4)).

[2] 29 U.S.C. § 2601(b)(2), (b)(3). This is effectuated by, for instance, requiring an employee to provide adequate notice to the employer. *See Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 303 (3d Cir. 2012). It should not, however, be accomplished by rejecting legitimate claims based on an arbitrary standard.

[3] *Cobb v. Contract Transport, Inc.*, 452 F.3d 543, 559 (6th Cir. 2006).

much of the day, totaling close to nineteen hours, is, in effect, truncating coverage and construing exceptions broadly. This denial is simply inconsistent with the remedial purpose of the FMLA. While I prefer the majority's test to the District Court's test, I find that it removes only the geographical discrepancies implicit in the District Court's proposed test.

In my view, the majority's clear, "bright-line" approach is an inequitable one. By defining "overnight stay" based on "one calendar day to the next," we fail to consider the multitude of factors impacting time of admission and the realities of our health care system. This is evident when we compare and contrast urban and rural hospitals. An urban hospital might be overrun with patients who lack health insurance and seek treatment in an emergency room. Thus, if an employee arrives at an urban hospital, he may be forced to wait hours before admission. Rural hospitals, on the other hand, face their own problems: smaller staffing and fewer beds might cause delays in admission.[4] The majority's

---

[4] The average wait time to see a physician further differs between geographic regions and also by payer type. In 2006, the average wait time to see a physician was as follows: Northeast (56 minutes), Midwest (50 minutes), South (61 minutes), West (49 minutes). When analyzed by payer type, the average wait time was: Private Insurance (55 minutes), Medicare (52 minutes), Medicaid (56 minutes), Worker's compensation (41 minutes), Self-pay (62 minutes), No charge/charity (81 minutes). U.S. Gov't Accountability Office, GAO-09-347, Hospital Emergency Department: Crowding Continues to Occur, and Some Patients Wait Longer than Recommended Time Frames 45-46 tbl. 13

calendar definition also fails to consider seasonal fluctuations in hospitals. For instance, flu season typically peaks in January and February.[5] If an employee falls ill during these months, the employee may face delays in admission not present during other periods in the year.[6]

In addition, an employee may face longer delays in admission depending on the day of the week he visits the hospital. Mondays, for instance, are considered the busiest day of the week, while Thursdays are considered the quietest

_____

(2009). While the difference in minutes appears miniscule, when we operate under the majority's approach, a minute can make or break an employee's claim.

[5] http://www.flu.gov/about_the_flu/seasonal/ (last visited May 7, 2015). Studies have shown that January appears to be the busiest month of the year in hospitals, whereas November and July are the least busy. Chad S. Kessler, M.D., et al., *Predicting Patient Patterns in Veterans Administration Emergency Departments*, XII Western Journal of Emergency Medicine 2, at 205 (May 2011).

[6] The CDC estimates the average wait time for all types of hospital to be over 120 minutes, or two hours, irrespective of these additional factors. This is the time measured from when the patient arrives until he sees a physician. http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6319a8.htm. Under the majority's approach, minutes are of key concern. Thus, a delay of 120 minutes clearly can impact an employee's chances of obtaining FMLA relief.

4

days.[7]   In fact, research has shown that there may be a "weekend effect" that "delays needed hospital care for weekend patients.  There is some evidence that hospital mortality is higher on the weekends for certain types of patients."[8]   This may lead "care providers [to] rush to discharge a patient on Friday so that they are out of the hospital by the weekend."[9]  Staffing on the weekend and "off hours" impacts admission and discharge time.  Whereas, "[t]he weekday hospital has a full administrative team, department chairs and service chiefs, experienced nurse managers, and a full complement of professional staff," in contrast "[t]he off-hours hospital . . . rarely, if ever, has senior managers present.  Nurse-to-patient ratios are significantly lower.  Even the number of residents is considerably lower . . . based on mandated work-hour restrictions."[10]   Indeed, an employee may be delayed admission based on the time of day he arrives at the hospital.  In 2006, the highest percentage of

---

[7] Kessler, at 205.

[8] *Plan ahead to avoid hospital delays on weekends*, The Commercial Appeal (Memphis), Mar. 15, 2010, *available at* 2010 WLNR 5417578.  "Care delays on weekends might be worse if a hospital is already full.  Many weekend patients have to wait until Monday or later to get certain tests or procedures." *Id.*

[9] *Id.*

[10] David J. Shulkin, M.D., *Like Night and Day – Shedding Light on Off-Hours Care*, The New England Journal of Medicine (May 2008).

admissions occurred between the hours of 9 a.m. and 5 p.m.[11] A study by a hospital consulting firm proved that patients who arrived in the emergency room between 7 a.m. and 3 p.m. reported higher satisfaction than those who arrived in the evening or overnight hours.[12] "By mid-afternoon, wait times may be on the rise as patient volumes have increased during the day. If a shift change is occurring during a particularly busy time, it may add to any actual or perceived disorganization or delays for patients."[13] Elective surgeries may result in fewer available beds, further back-logging admission irrespective of the day of week or hour of the day.[14] This practice forces ER patients to be "boarded" in the Emergency Department or in hospital hallways until beds become available.[15] All of these factors impact a patient's admission and discharge times and yet the majority's approach is blind to them.

---

[11] Kessler at 205.

[12] Emergency Department Pulse Report 9, *available at* http://www.pressganey.com/Documents_secure/Pulse%20Re ports/2010_ED_Pulse_Report.pdf. The "[s]taffing patterns, patient volume, and acuity of patient conditions may play a large part in these differences in satisfaction." *Id.*

[13] *Id.*

[14] U.S. Gov't Accountability Office, GAO-09-347, Hospital Emergency Department: Crowding Continues to Occur, and Some Patients Wait Longer than Recommended Time Frames 2 (2009).

[15] *ER wait times endanger health*, Asbury Park Press, June 28, 2009, *available at* 2009 WLNR 15689777.

Furthermore, a temporal definition fails to consider transportation issues that may impact admission time. These may include: variances in traffic patterns which may delay an employee's arrival at the hospital; proximity and travel time to a hospital; availability of public versus private transportation; and seasonal weather issues such as snow storms, which may affect travel.

Finally, the "one calendar day to the next" approach also fails to take into account the intercession of everyday annoyances. For example, an employee is being driven to the hospital at the onset of his illness, and his transportation becomes disabled. He arrives at the hospital at 12:05 a.m. and remains in the hospital until 7 p.m. the next evening, a total of nineteen hours. This employee would not qualify for FMLA relief. But a separate employee arriving at 11:55 p.m. would merit relief. Or, consider the employee who arrives at 11:55 p.m., but because of staffing problems, the employee is not formally admitted until 12:02 a.m. He would not qualify for FMLA relief. Under the majority's proposed test, we deny FMLA protections to the employees in both scenarios simply based off a few minutes difference in time of admission.

In light of the myriad problems we face in construing "overnight stay" temporally, I, instead, propose a totality of the circumstances approach. There are many factors probative of an overnight stay in a medical facility. Among the most important is the time an employee is formally admitted to the hospital and the time he is discharged from the hospital. Instead of relying on an arbitrary cut-off time, the court can balance whether the employee was discharged an hour after being admitted, or whether the employee spent

7

fourteen hours in the hospital. Another factor is whether the employee spent at least part of the traditional night hours in the hospital—tracking the DOL's definition of "inpatient care." The DOL contemplated an "overnight stay" in a medical facility; thus, spending ten hours during the day from 7 a.m. until 5 p.m. may weigh against a finding of an "overnight stay," whereas spending ten hours from 7 p.m. until 5 a.m. would weigh in favor of such a finding.

An additional factor is whether admission was followed by an assignment to a room. This factor is used in other contexts, such as Medicaid. Medicaid defines "inpatient" as "a person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services."[16] Other relevant factors include the severity of the medical issue presented, whether the hospital ran extensive tests, and the hospital's classification of the employee as an "inpatient" or "outpatient." The benefit of this analysis is that a court may assess the entire picture of an employee's hospital experience and then determine whether that employee is entitled to relief under the FMLA.

The material facts in this case are not in dispute. As previously stated, Bonkowski arrived at the hospital prior to midnight on November 14, and the hospital admitted him as an "inpatient" shortly after midnight. He stayed at the hospital for more than fourteen hours, being discharged in the early evening of November 15. While hospitalized, he

---

[16] *Barrows v. Burwell*, 777 F.3d 106, 108(2d Cir. 2015) (citing Medicare Benefit Policy Manual, CMS Pub. No. 100–02, ("Medicare Policy Manual") Ch. 1, § 10).

underwent comprehensive testing. Under these circumstances, I would conclude that Bonkowski had an overnight stay in the hospital.

The majority fears that the totality of the circumstances approach would make it more difficult for both employers and employees to predict the circumstances that would give rise to an "overnight stay" and could lead to additional litigation in the future with possibly inconsistent results. There are no material issues of fact in Bonkowski's case, and I believe there will be no material issues of facts in most of these types of cases. Events leading to an employee's "overnight stay" at a hospital such as travel to the hospital, the day, date and time of arrival, the time the employee signs into the hospital, the time of admittance and discharge, and the employee's medical report are seldom matters of factual dispute. In such cases, I believe that the district court should be free to consider all of the circumstances presented and conclude whether, as a matter of law, the employee has suffered a "serious health condition" under 29 U.S.C. § 2111(11)(A).

Several courts have held that whether an employee suffers from a serious health condition is properly considered a question of law.[17]

---

[17] *See, e.g.*, *Alcazar-Anselmo v. City of Chicago*, No. 07 C 5246, 2011 WL 3236024, at \*2 (N.D. Ill. July 27, 2011) (on summary judgment, analyzing the "continuing treatment by a health care provider" prong of 29 U.S.C. § 2111); *Helmick v. Solid Waste Auth. of Cent. Ohio*, No. 2:07-CV-912, 2009 WL 650417, at \*6 (S.D. Ohio Mar. 10, 2009) (same); *Whitworth v. Consol. Biscuit Co.*, No. CIV.A. 6:06-112-DCR, 2007 WL

Similar to the majority's approach, where the facts are undisputed in a case, the district court may, in its discretion, quite easily determine whether an employee had an overnight stay in the hospital weighing the factors I proposed. The only difference is that a totality of the circumstances approach simply considers more of the evidence rather than solely the "one calendar day to the next day" approach that the majority proposes. Where material facts in the record are disputed, of course, summary judgment cannot be granted and the case must be submitted to a jury—but this is true under any approach.

For these reasons, I dissent in favor of a totality of the circumstances approach. Unless and until the DOL clarifies the definition of "overnight stay," this approach offers a practical and more equitable inquiry into an employee's hospital experience, and one that more fully comports with the remedial purpose of the FMLA.

---

1075774, at *8 (E.D. Ky. Apr. 6, 2007) ("To establish that she was incapacitated within the meaning of the FMLA, a plaintiff must prove that she suffered from an 'inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.' 29 C.F.R. § 825.114(a)(2)(i). This determination is a question of law, and the plaintiff bears the burden of proving the objective existence of a serious health condition that incapacitated her during the period in question.").